468 So.2d 1279 (1985)
SUCCESSION OF Felix RIGGIO.
No. CA 84 0149.
Court of Appeal of Louisiana, First Circuit.
April 16, 1985.
Writ Denied June 17, 1985.
*1281 Iddo Pittman, Jr., Hammond, for plaintiffs-appellants, Anna Cannizzaro, Carmillar Riggio, Joseph Riggio, Anthony Riggio, Mary Riggio Tillis, Rose Riggio Domiano, Salvador Riggio, Catherine A. Schillace, and Frances R. Richoux.
Curtis M. Baham, Jr., Hammond, for defendants-appellees, Peter Riggio and Felix Anthony Riggio.
Before COLE, CARTER and LANIER, JJ.
LANIER, Judge.
This is a suit to nullify a statutory will for lack of testamentary capacity and to collate an inter vivos donation made to a forced heir. The unsuccessful plaintiffs-heirs took this suspensive appeal.

FACTS
Mary Christina (Mrs. Riggio) and Felix Anthony Riggio (Mr. Riggio) were lawfully married and of this union ten children were born, namely: (1) Carmilla, (2) Joseph, (3) Anthony, (4) Mary R. Tillis, (5) Rose R. Domiano, (6) Salvador "Sam", (7) Ann R. Cannizzaro, (8) Peter, (9) Catherine "Katie" R. Schillace and (10) Frances R. Richoux. Mr. and Mrs. Riggio owned a tract of land comprising approximately ten acres in Hammond, Louisiana.
On September 12, 1955, Mrs. Riggio executed a statutory will. In it she granted one acre of ground to her son, Peter, which acre would be located around the house Peter was to build on the property. She appointed Peter the executor of her will and provided the "one acre of ground is to be accepted by ... Peter ... as his full share of my estate." She also declared her husband would "have full charge and control of all property", except for the disposition to Peter. No other dispositions were made.
On December 19, 1961, Mr. Riggio sold approximately one and one-fourth acres of the property to Edward H. Hayden.
Mrs. Riggio died on April 25, 1962.
On June 2, 1970, Peter executed a renunciation of his mother's succession before a notary and two witnesses. On March 16, 1971, Peter had his mother's will probated and was designated testamentary executor.[1]
On November 12, 1971, Mr. Riggio purportedly sold a lot measuring 209.1 feet by 125 feet from his property to Felix Anthony Riggio for $1,500. The vendee was Peter's son and was known as "Little Pete".
On March 23, 1972, Peter mortgaged his interest in Mrs. Riggio's succession to Damien Kinchen. On December 14, 1972, Peter sold his interest in Mrs. Riggio's succession to Damien Kinchen.
On February 24, 1973, Mr. Riggio purportedly sold his undivided one-half interest in the remaining 8.59 acres of his property to Little Pete for $20,000. On April 23, 1973, Mr. Riggio filed suit against Little Pete seeking to annul this sale and alleging lack of consent due to intimidation, failure of consideration, lesion beyond moiety and fraud.[2] On December 11, 1973, the *1282 district court rendered a judgment in this suit annulling the purported sale and recognizing Mr. Riggio as the owner of an undivided one-half interest in the property. Apparently, there was no appeal from this judgment.
On February 21, 1974, Mr. Riggio and nine of his children (excluding Peter) filed a petition in Mrs. Riggio's succession contending Peter renounced his interest in Mrs. Riggio's succession in 1970, Peter should be removed as testamentary executor, the mortgage and sale by Peter to Damien Kinchen in 1972 should be annulled, the 1971 sale of the lot by Mr. Riggio to Little Pete should be annulled and Mr. Riggio and his nine children should be placed in possession of Mrs. Riggio's interest in the property.
On October 10, 1975, Mr. Riggio suffered a stroke and was subsequently placed in a nursing home.
On March 9, 1976, counsel for Mr. Riggio and the nine children, Iddo Pittman, Jr.,[3] filed a notice to take the deposition of Mr. Riggio at 2:00 p.m. on March 31, 1976, at Mr. Riggio's nursing home. On March 10, 1976, Mr. Pittman filed a notice to take the depositions of Peter and Little Pete at 10:00 a.m. on March 31, 1976. The depositions of Peter and Little Pete were taken as scheduled with their attorney, Mr. Timothy R. Higgins, in attendance. The deposition of Mr. Riggio was not taken on March 31, 1976, because on that date Dr. J. De-Loach Thames issued a medical certificate which stated as follows:
This is to certify that Felix A. Reggio is confined to Belle Maison Nursing Home under treatment for arteriosclerosis with vascular changes in the brain and infirmities of the aged and arthritis. He is now totally unable to care for himself and is physically and mentally incapable of giving a deposition or testifying in court in any legal matter.
This certificate was also used to excuse Mr. Riggio from a deposition scheduled by Mr. Higgins on May 5, 1976.
However, on March 31, 1976, Mr. Riggio executed a statutory will before a notary public, Lonny A. Myles, and two witnesses, Betty B. Duvic and Leona McKay. The will had been prepared by Mr. Higgins. By the terms of this will, Peter was appointed administrator, the law firm of Morrison and Higgins was appointed to represent the administrator and the disposable portion of Mr. Riggio's estate (1/3) was left to Little Pete. Peter and Mr. Higgins were at the nursing home for the execution of the will.
On March 22, 1978, Mr. Riggio gave a deposition at the nursing home.
On April 12, 1978, the trial in Mrs. Riggio's succession was held. During the trial, four of the Riggio children testified (excluding Peter): Ann, Sam, Rose and Katie. On cross-examination by Mr. Higgins, the four children indicated Mr. Riggio was mentally alert, understood the nature of his affairs and was of sound mind.[4]
On May 29, 1978, Mr. Riggio died at age 89.
On July 17, 1978, the district court rendered a judgment which decreed as follows: (1) the ten children were sent into possession of Mrs. Riggio's estate in equal portions, subject to Mr. Riggio's usufruct; (2) Mrs. Riggio's will was declared null; (3) Peter's renunciation of Mrs. Riggio's succession was declared null; (4) the mortgage and sale by Peter to Damien Kinchen were declared valid; (5) the sale of the lot by Mr. Riggio to Little Pete was declared null; and (6) Peter was removed as testamentary executor. The nine children took a suspensive appeal from this judgment, but the *1283 matter was compromised before this court rendered a judgment.[5]
The succession of Mr. Riggio was opened on April 6, 1979, with a petition by his daughter, Ann, to be appointed administratrix. An order so appointing her was issued that same day. This pleading alleged Mr. Riggio died intestate. The nine children and their attorney (Mr. Pittman) had no knowledge of Mr. Riggio's will at this time.
On June 13, 1979, Ann and the eight other Riggio children filed a petition in Mr. Riggio's succession against Peter contending he received his share of the succession during his father's lifetime (the proceeds of the 1961 sale) and had no interest in the succession, or, in the alternative, the property he received should be collated to the succession. On September 28, 1979, Peter filed an answer and a reconventional demand in which he contended Mr. Riggio left a last will and testament dated March 31, 1976, asked that the will be probated and sought the removal of Ann as administratrix because he was appointed such in the will. On October 22, 1979, Ann filed an answer to the reconventional demand in which she contended Mr. Riggio lacked testamentary capacity to execute the will and the will was ambiguous because Mr. Riggio had more than one grandson named Felix Anthony Riggio.
A trial of this matter was held on March 6, 1980. A summary of the testimony of this trial is found in Succession of Riggio, 405 So.2d 513, 514-515 (La.1981) as follows:
Mr. Riggio suffered a stroke on October 10, 1975. As a result of the stroke he entered a nursing home and resided there until his death except for a brief interval when he was being treated by an orthopedic surgeon for a fractured hip. Dr. Thames, Mr. Riggio's family physician of long standing, testified concerning the health of his patient. According to the doctor, Mr. Riggio had recurrent mild strokes and developed what the doctor termed `chronic brain syndrome' where `he was not really himself.' On cross-examination, the doctor stated that, although people with this condition do have a very few lucid intervals during which they may remember a person visiting, `five minutes later they don't ever know that you have ever been there.'
Regarding depositions scheduled for March 31, 1976, during the succession proceeding for Mr. Riggio's deceased wife, Dr. Thames had certified that Mr. Riggio was `totally unable to care for himself and [was] physically and mentally incapable of giving a deposition or testifying in Court in any legal matter.' The doctor signed this certificate on March 31, 1976, by coincidence the same date as the will being challenged in the instant suit.
In the trial court proceedings in the case before us, the doctor testified that he had no reason to change his mind concerning Mr. Riggio's condition on March 31, 1976: that he was still of the opinion that Mr. Riggio had been incapable of giving a deposition or testifying on that date. The doctor said that he did not know whether in a legal sense Mr. Riggio had the capacity to make a will on that date, but that it was his opinion that medically Mr. Riggio lacked the mental capacity to do so.
Although Dr. Thames stated that he did not know exactly when he had seen Mr. Riggio before March 31, 1976, he emphasized that he saw all nursing home patients at least once a month. He also stated that it was usually the latter part of the month when he visited the patients in the nursing home where Mr. Riggio was confined.
Mr. Riggio's daughter, Anna, testified that she had seen her father three times at the nursing home on March 31, 1976, and he was unable to recognize her. She further testified that her father did not mention making a will that day or that he was going to do so that day or that he was interested in making a will. On cross-examination, she admitted that previously she had stated that her father retained his mental capacity, but explained *1284 that this statement was made while her father was still alive and that she did not wish to embarrass him by informing people of his deficient mentality. Additionally, Anna said that shortly before his death, over two years after the March 31, 1976, will in contest, her father expressed a desire to make a will and that she dissuaded him by explaining that a will was not needed because his property was clear of debt and his children would share his property anyway. To this recommendation, her father did not retort by advising that he had made an earlier will.
The will at issue left a two-thirds interest of the testator's property (the legitime) to be divided equally among his ten children. A one-third interest was bequeathed to the `grandson who bears my name, Felix Anthony Riggio.' Opponents of the will introduced into evidence the suit of Mr. Riggio against a grandson, Felix Anthony Riggio, in which Mr. Riggio obtained a judgment voiding and cancelling a purported cash deed of his property to that grandson. The petition had alleged fraud and duress in the transaction. This grandson is the son of Peter Riggio who is the defendant in the instant suit. There is another grandson who is named Felix Anthony Riggio, son of one of Mr. Riggio's children who is aligned with eight of his brothers and sisters as plaintiffs in this case.
The proponents of the will offered no live testimony at the hearing. They did introduce into evidence an affidavit by the notary and one witness before whom the will was executed. This affidavit, however, does not address the testamentary capacity of Mr. Riggio. The affiants only state that the document in evidence is the will executed and that they are respectively the notary and witness on the document. The proponents of the will also offered into evidence, in support of their contention that Mr. Riggio had acceptable mental capacity, a deposition given by Mr. Riggio on March 22, 1978, almost two years after the date of the will under challenge. They point to the questions and Mr. Riggio's answers in the transcript of the deposition as evidence of soundness of mind on that day in March 1978. While this may not be indisputable evidence regarding sound mental capacity in March 1978, and certainly is not directly pertinent to soundness of mind on March 31, 1976, Mr. Riggio's responses in that deposition were pertinent and indicated a memory of past events.
In a judgment rendered on July 25, 1980, the district court held the application for administration was premature, a future hearing would be held to probate the will, the testator's lack of testamentary capacity had not been established, the question of collation was not yet before the court and a proper petition to probate the will would be filed. The nine children took a suspensive appeal. This court held (1) the original appointment of Ann was proper; (2) if Peter could establish the validity of the will he was entitled, after appropriate proceedings, to replace Ann as succession representative; (3) Mr. Riggio had testamentary capacity and made a valid will on March 31, 1976; and (4) the issue of collation should have been decided on original hearing and would be decided on remand. Succession of Riggio, 395 So.2d 361 (La.App. 1st Cir. 1981). The nine children sought a supervisory writ from the Louisiana Supreme Court contending this court committed error by holding Mr. Riggio had testamentary capacity when he executed the contested will. The Supreme Court granted the writ and ruled the contested judgment was premature and testamentary capacity should be determined in a contradictory proceeding in connection with the probate of the will. The judgment on testamentary capacity was vacated, and this case was remanded to the district court. Succession of Riggio, 405 So.2d 513 (La.1981).
This matter was retried in district court on March 21, 1983.[6] In a judgment rendered *1285 on August 10, 1983, the district court held (1) Mr. Riggio had the mental capacity to execute the will and the will was valid; (2) Peter was entitled to be executor of the will and was recognized as such; (3) there was insufficient evidence to establish the claim for collation; and (4) Little Pete was the person designated in the will to receive the disposable portion.[7]

TESTAMENTARY CAPACITY
The appellants contend that the district court was in error by finding the document dated March 31, 1976, was valid as the will of Mr. Riggio.
Dr. Thames testified again at the retrial of this case, and his testimony was essentially the same as the original trial, except he indicated Mr. Riggio had the type of personality which made him subject to persuasion.
The notary on the will, Lonny A. Myles, testified the execution of the will was scheduled "a few days beforehand." Mr. Higgins contacted him and asked him to be the notary because of possible litigation. Myles received no fee for his work but executed the will as a favor to Mr. Higgins. Myles met Higgins and Peter at Mr. Riggio's nursing home at approximately 3:00 p.m. on March 31, 1976. The two witnesses were secured at the nursing home. Myles read the will to Mr. Riggio and discussed it with him. Myles thought Mr. Riggio knew what he was doing and would not have acted as notary had he thought otherwise. Peter told Mr. Riggio in Myles' presence that Little Pete would get the disposable portion. Myles spent about twenty minutes going over the will with Mr. Riggio. Myles pointed to the correct line and Mr. Riggio signed on the line. No one helped him to sign. After the will was executed, Mr. Higgins took possession of the will. Mr. Higgins also explained the disposable portion to Mr. Riggio and he said he understood it.
Betty Duvic testified she was a licensed practical nurse who worked at the nursing home from October of 1971 to July of 1976. She worked on Mr. Riggio's wing of the nursing home and saw him three or four times a day for five or six days a week during the time that Mr. Riggio was in the nursing home from October of 1975 until she left the nursing home's employment in July of 1976. Duvic testified as follows concerning the execution of the will:
Q. Do you know the approximate time of day that this will was executed?
A. Well, it was right after I came on duty and I work the 3 to 11 shift, and it was shortly after that. So, it would be somewhere in the neighborhood between 3:00 and 3:30 in the afternoon.
Q. Did someone come and get you to tell you that a will was going to be executed?
A. Yes, Mr. Guitreau did ... the present administrator, Paul Guitreau.
Q. Came and told you that there would be a will that would be executed?
A. Yes.
Q. And that witnesses
A. And he told me to observe standard procedure.
Q. And what was the standard procedure?
A. Standard procedure is asking the patient... the resident, their name, their age, what day it is, whether it is morning or evening, how many children do they have, who is the President, what my name was, just general things. That's the standard procedure ... standard nursing procedure. That's something that has to be done in a case like this. If there isIf there's any document that's signed by a resident of the nursing, if there's any document at all, you have to observe this procedure, because it's policy.

*1286 Q. Did you ask Mr. Riggio specifically the questions that we just went over?
A. Yes, I did.
Q. Did he respond correctly to those questions?
A. Yes sir, he did.
Q. Now, who all was present when the will was being executed?
A. Mr. Myles, Mr. Higgins, Mr. Pete Riggio, the father of the gentleman here ...
Q. Felix Anthony Riggio ... the father of him, okay.
A. Okay. And Leona McKay, which was one of my aides at that time and myself ... Mr. Riggio, of course.
Q. Now, when you asked Mr. Riggio those questions that we just covered, did he understand them?
A. Yes.
Q. And he responded correctly?
A. Yes, he did.
Q. Was there other conversation in your presence regarding the will?
A. Yes, there was.
Q. And you heard the questions posed to Mr. Riggio, is that correct?
A. Yes sir, I did.
Q. Did he respond that he understood those questions?
A. Yes and I tried to explain to him what was going on and asking him at each ... like at each paragraph, I asked him, did he understand exactly what was being said and he responded, yes he did.
Q. Is there any doubt in your mind at all that Mr. Riggio signed and ... when he signed and executed the will that he knew what he was doing?
A. I feel that the resident was alert at the time, yes sir.
Q. Was there any discussion that his grandson, Felix Anthony Riggio, was to receive something in the will?
A. Yes sir. There was a discussion to that effect.
Q. Was there any doubt in your mind as to who was the grandson named Felix Anthony Riggio?
A. No sir, there was not, because it was explained to Mr. Felix at the time that the grandson in question was Little Pete.
Q. And that's how he was referred to to Mr. Riggio?
A. That's right.
Q. Has Little Pete ever come to the nursing home and visited with his grandfather, to your knowledge?
A. Yes sir.
Q. And Mr. Felix Anthony Riggio signed the will of his own volition in your presence?
A. Yes sir, he did.
Q. Was the other witness and the notary present at all times?
A. Yes.
Duvic testified on rebuttal Mr. Riggio had partial use of his right arm at the time the will was written.
Little Pete testified he visited his grandfather in the nursing home three or four times a week and that the location of the other witness to the will, Leona McKay, was unknown.
Leon Cannizzaro, Ann's son, testified he was an Assistant District Attorney in Orleans Parish, he saw Mr. Riggio about once a month between 1975 and 1978, sometimes Mr. Riggio did not recognize him and Mr. Riggio never discussed a will with him.
Katie Schillace testified she saw her father in the nursing home every day. After Mr. Riggio fell and broke his hip, he could not use his right hand, feed himself or light his pipe. Katie did those things for him on numerous occasions. Mr. Riggio did not recognize Katie on occasions. He repeated himself often. After he fell and broke his hip, he was wheelchair bound and tried to put his wheelchair in motion with his left hand. Mr. Riggio was right-handed and could not use his right hand after he broke his hip. Mr. Riggio did not talk business with her.
*1287 Mary Tillis testified she visited Mr. Riggio in the nursing home once a week. Mr. Riggio did not recognize her on some occasions and could not manage his affairs after he broke his hip. Mr. Riggio could not understand some conversations. Mary fed him on occasion. Mr. Riggio was right-handed, and, after his stroke, he could not use his right hand. After he broke his hip, he never walked again.
Felix Anthony Riggio II testified he was the son of Anthony Riggio and Mary Cannina Riggio. He visited his grandfather every month or two. Mr. Riggio did not always recognize him when he visited. Sometimes, Mr. Riggio did not know what he was talking about.
Ann Cannizzaro testified Mr. Riggio never wrote a check after he had his stroke on October 10, 1975. For about ten years, Mr. Riggio signed his name Felix A. Riggio, Sr. so his account would not get confused with that of Little Pete. The will was not signed with a Sr. On March 31, 1976, Ann left her home in New Orleans and with her sister, Rose, went to Hammond for depositions. Before going to Mr. Pittman's office at 10:00 a.m. for the depositions of Peter and Little Pete, she visited Mr. Riggio at the nursing home. Mr. Riggio's condition was poor at that time. He recognized her after awhile and wanted to know why she was there. She stayed approximately thirty minutes and then went to Mr. Pittman's office for the depositions. She went back to the nursing home between 11:30 a.m. and 12:30 p.m. with Rose. Katie joined them there. Mr. Riggio said he had eaten but wanted a coke, which they got for him. She did not want Mr. Riggio disturbed for a deposition that afternoon and between 12:30 and 1:30 p.m. went to Dr. Thames and got a medical excuse. The deposition was then called off. She saw Mr. Riggio about once a week. Ann, Rose and Katie were with Mr. Riggio until approximately 4:00 p.m. Mr. Riggio slept most of this time. Mr. Riggio never wrote anything after his stroke. Mr. Riggio could not manage his affairs, and his children did so for him. She was present when Mr. Riggio gave his deposition on March 22, 1978.
Rose Domiano testified she visited Mr. Riggio twice a week. He never walked or used his right hand after he had the stroke and broke his hip. She and her husband would feed him and light his pipe. Sometimes, he would recognize her and sometimes not. She gave essentially the same testimony as Ann concerning the visits to Mr. Riggio at the nursing home on March 31, 1976, except that she indicated they left the nursing home between 4:00 and 5:00 p.m. On March 31, 1976, Mr. Riggio was sometimes lucid and sometimes not. She did not know about the will until after Mr. Riggio died.
Sam Riggio testified that after Mr. Riggio had his second stroke and broke his hip, he was not the same person. On some occasions he would not recognize Sam. He tried to eat by feeding himself with his left hand. Sam never saw Mr. Riggio use his right hand or arm after the stroke. Sam visited Mr. Riggio every week or two.
The testimony of Dr. Richard F. Strobach, a medical doctor specializing in psychiatry, was submitted by deposition. He testified that if Mr. Riggio was able to give his name and age, the time of day, the day of the week, the date, where he was located, the number of his children and the names of the people in his presence, he was oriented to time, person, place and object and was lucid. Dr. Strobach reviewed the deposition given by Mr. Riggio on March 22, 1978, and found it showed Mr. Riggio's remote memory was intact and he did not have organic brain syndrome with dementia. Mr. Riggio's deposition also showed his recent memory was intact at the time the deposition was taken. Since Mr. Riggio's recent memory was intact in 1978, it was extremely unlikely such memory was not intact in 1976, because, if recent memory is lost due to organic process, it is extremely rare for it to be regained. Dr. Strobach conceded he never examined Mr. Riggio. He defined a stroke in the brain as a sudden loss of neurological function caused by a compromise of the blood supply. Dr. Strobach did not agree with Dr. Thames' diagnosis of Mr. Riggio on March 31, 1976.
*1288 The law applicable to determining testamentary capacity is set forth in Succession of Lyons, 452 So.2d 1161, 1164-1166 (La.1984), as follows:
The capacity to make a will is tested at the time the will is made. LSA-C.C. art. 1472. To make a donation mortis causa, a person must be of sound mind. LSA-C.C. art. 1475. The question is whether the testator understood the nature of the testamentary act and appreciated its effects.... The burden of proving lack of testamentary capacity is upon the party alleging it....
There is a presumption in favor of testamentary capacity.
....
The traditional measure of persuasion in civil cases is a preponderance of the evidence, but there are a limited number of claims and contentions governed by an intermediate standard, usually termed `clear and convincing evidence.'
Generally, this third burden of proof requires more than a `preponderance of the evidence' but less than `beyond a reasonable doubt'. The existence of the disputed fact must be highly probable, that is, much more probable than its non-existence.... This standard is usually employed `where there is thought to be special danger of deception, or where the court considers that the particular type of claim should be disfavored on policy grounds.' McCormick on Evidence, Section 340(b), p. 798 (2nd ed. 1972).
....
Strong policy considerations are also involved when testamentary capacity is disputed. As the court stated in Kingsbury v. Whitaker, supra:
`To wrest a man's property from the person to whom he has given it, and to divert it to others from whom he has desired to withhold it, is a most violent injustice, amounting to nothing less than post-mortem robbery, which no court should sanction, unless thoroughly satisfied ... that the testatory was legally incapable of making a will.' 32 La.Ann. 1055 at 1062-1063 [(1880)].
These considerations require that a party alleging lack of testamentary capacity overcome the presumption of capacity by clear and convincing evidence. [Citations omitted]
What constitutes clear and convincing evidence is further explained in State v. Johnson, 458 So.2d 937, 942 (La.App. 1st Cir. 1984), writ denied, 463 So.2d 593 (La.1985), as follows:
To further put this definition in perspective, and as indicated in the above quote, clear and convincing evidence requires more proof than a `preponderance of the evidence.' A preponderance of the evidence has been defined as follows:
A preponderance of the evidence means evidence of greater weight or evidence which is more convincing than that offered in opposition to it.

Starks v. Kelly, 435 So.2d 552, 556 (La. App. 1st Cir.1983).
And clear and convincing evidence is less than `beyond a reasonable doubt.' `Beyond a reasonable doubt' has been defined as follows:
A reasonable doubt is not a mere possible doubt. It should be an actual or substantial doubt. It is such a doubt as a reasonable man would seriously entertain. It is a serious doubt, for which you could give good reason.

State v. Taylor, 410 So.2d 224, 225 (La. 1982).
The district court judge, in his reasons for judgment, accepted the testimony of the notary, Myles, and the witness, Duvic, and found the appellants had failed to establish Mr. Riggio lacked mental capacity at the moment of execution of the will by clear and convincing evidence. We have carefully reviewed the relevant evidence of record and conclude this factual determination by the district court is not clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
At the trial, appellants attempted to call as a witness Dr. John Andriani, an expert in the fields of pharmacology and anesthesiology. Dr. Andriani had been subpoenaed but did not appear at the trial, apparently *1289 because he had a conflict with another case. Counsel for the appellants offered to submit Dr. Andriani's testimony by deposition, but this request was denied by the court. The court did permit the appellants to submit the deposition of Dr. Andriani as a proffer. However, the deposition is not contained in the record before us. Assuming this to be a clerical oversight, we have reviewed the excerpts of Dr. Andriani's testimony in the appellants' brief and, even assuming this evidence is admissible, it would not affect our ruling on the district court's factual conclusion on testamentary capacity.
This assignment of error is without merit.

COLLATION
The appellants contend the district court committed error because Mr. Riggio used the proceeds of his sale to Edward Hayden in 1961 to pay Peter's debt, this constituted a donation to Peter and this money ($3,000) should have been ordered collated into Mr. Riggio's succession.
In his deposition of March 22, 1978, Mr. Riggio testified his son, Peter, ran a barroom which was losing money on a monthly basis. Mr. Riggio signed a note at the bank for Peter, and the bank subsequently called on him to pay the note. Mr. Riggio sold a piece of his land to obtain funds to pay Peter's debts. Mr. Riggio got a lawyer (Mr. Curet) and sold a piece of land for $3,000. This money was used to pay Peter's debts and, after all debts were paid, there was about $250 in cash left over which was given to Peter. The debts were paid by the attorney. Mr. Riggio did not get any money personally from the sale; all of the purchase price was either used to pay Peter's debts or given to Peter.
At the original trial in this case held on March 6, 1980, Ronald A. Curet testified he was an attorney and acted as the notary on the sale by Mr. Riggio to Edward H. Hayden on December 19, 1961. Mr. Curet testified the proceeds of the sale were used to pay Peter's debts. Mr. Curet's testimony in the Succession of Mrs. Riggio was adopted as part of his testimony in the instant case. In that testimony, Mr. Curet stated the reason for the sale was to pay off Peter's debts.
In his deposition[8] of March 31, 1976, Peter admitted he received $500 from the sale to pay the Progressive Finance Company. (In his testimony, Mr. Curet indicated the payment to Progressive Finance Company was $864). In his testimony in Mrs. Riggio's succession, Peter admitted he received $84.02 to pay the debt of the Guaranty Bank and Trust Company. Peter denied any other payments out of the Hayden sale. (Mr. Curet testified a payment of $1,916.64 was made to Joe Spitale.)
The testimony of Mr. Riggio and Mr. Curet and the admissions of Peter are sufficient to establish the collation claim.
Collation is defined in Doll v. Doll, 206 La. 550, 19 So.2d 249 (1944), 19 So.2d at 251-252, as follows:
Collation is the returning to the estate of a deceased person any gifts or advances which any of the descendant heirs may have received by donation or otherwise during the lifetime of the ancestor from whom the heirs inherit. The collation may be made in fact, by actually returning to the succession the property or money received from the deceased during his lifetime, or it may be made by deducting from the inheritance of an heir the amount of his collation in the settlement of the succession. This is explained in article 1227 of the Civil Code, where it is declared that the purpose of the collation is `in order that such property [collated] may be divided together with the other effects of the succession.' The obligation to collate applies only to descendant heirs and only to gifts or *1290 advances received by them by donation or otherwise during the lifetime of the ancestor. Rev.Civ.Code, art. 1228. It is declared in article 1229 that the obligation of collation is founded upon the equality which must be maintained between or among children and other lawful descendants, who divide the succession of their ancestor, and also upon the presumption that any advances or donations made by an ancestor to his presumptive heirs during his lifetime are made `in advance of what they [the presumptive heirs] might one day expect from their [the ancestors'] succession.' For that reason the obligation to collate is not appliable to what is given or bequeathed by last will or testament, except in the sense that if a direct descendant heir has received a donation during the lifetime of the ancestor, the heir cannot claim a legacy under the last will and testament of the ancestor without collating, either actually or by taking less, the amount received during the lifetime of the ancestorunless the donation and the legacy are expressly declared by the donor or testator to be given as an advantage over the other heirs, and in addition to the share to be inherited by the donee. Rev.Civ.Code, art. 1228.
See also, L. Oppenheim, Successions and Donations § 32 in 10 Louisiana Civil Law Treatise 106 (1973).
Collation is presumed and takes place if the donor has ordered it or remained silent. La.C.C. art. 1230. The burden is on a donee to exculpate himself from collation by clear and convincing evidence. Succession of Gomez, 223 La. 859, 67 So.2d 156 (1953). Collation is due for what has been expended by parents for the payment of the forced heir donee's debts. La.C.C. art. 1243. Peter has not shown by clear and convincing evidence that the donation of the money to pay his debts was intended to be an extra portion. Mr. Riggio's will shows a contrary intention because all of the disposable portion is given to a person who is not a forced heir and the forced portion is divided equally between the ten forced heirs. Since Mr. Riggio used the proceeds of the sale to Hayden to pay Peter's debts, the remaining forced heirs in Mr. Riggio's succession are entitled to collation of $3,000. Cf. Succession of Duvio, 449 So.2d 147 (La.App. 4th Cir.1984), writ denied, 450 So.2d 968 (La.1984).
The collation of money may be made in money or by taking less, at the choice of the donee. La.C.C. art. 1285. If the donee elects to take less, it is done in the same manner as is prescribed for the collation of immovable property. La.C.C. arts. 1285 and 1269. Peter Riggio is ordered to elect which method of collation he will utilize and comply with that method within thirty days after this judgment becomes executory.
In his reasons for judgment, the district court judge denied collation because the appellants "did not offer sufficient evidence into the record to prove their case, having failed to show the value of the active mass of the succession and the value of alleged donation to Peter Riggio at the time of said alleged donation." To prove a claim for reduction of a donation (as distinguished from collation), under La.C.C. art. 1502, it is necessary to prove there has been an impingement on the legitime of the forced heirs, that is, the value of the donations, whether inter vivos or causa mortis, made by the decedent have exceeded the value of the disposable portion of decedent's estate. Such a determination requires a calculation of the disposal portion under La.C.C. art. 1493, which in turn can be made only after a calculation of the active mass of the succession under La.C.C. art. 1505. However, such requirements are not necessary for a collation. In the instant case, each of the ten forced heirs is receiving his forced portion, and Little Pete is receiving the disposable portion. Peter is required to collate the amounts donated to him by way of payment of his debts because it has not been shown this is an extra portion. The appellants have not requested a reduction, only collation.[9]
*1291 The district court judgment denying collation is reversed.

DECREE
For the foregoing reasons, the judgment of the district court determining that Mr. Riggio had testamentary capacity when he executed his will on March 31, 1976, is affirmed. The judgment of the district court denying collation is reversed, and Peter Riggio is ordered to collate the proceeds of the sale donated to him in 1961 in accordance with law and the views expressed herein. The appellants[10] shall pay one-half of all costs and the appellees shall pay the other one-half of all costs.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART.
NOTES
[1] These proceedings were filed of record on March 17, 1971. At the original trial of the instant case on March 6, 1980, counsel for Peter introduced the entire record of Mrs. Riggio's succession (docket # 6196) into evidence with the consent of counsel for the plaintiffs. After the remand of this case in 1981, Little Pete was made a party defendant. At the trial on remand, counsel for the plaintiffs attempted to reintroduce this succession record into evidence, but the trial court sustained an objection by counsel for the defendants. Counsel for the plaintiffs then proffered the record. This record may be considered because it was properly filed in evidence at the original trial. Cf. Caldwell v. Texas Industries, Inc., 441 So.2d 472 (La.App. 2nd Cir.1983). In any event, this record has some relevance on the issue of testamentary capacity and is admissible. La.R.S. 15:492. In addition, Peter's testimony at the trial of this matter has an admission relevant to the issue of collation.
[2] This entire suit record (docket #42137) was filed in evidence in the instant case at the original trial by counsel for the plaintiffs with the consent of counsel for Peter. After the remand of this case by the Louisiana Supreme Court in 1981, Little Pete was made a party defendant. At the subsequent trial on remand, counsel for the plaintiffs attempted to reintroduce this suit record into evidence, but the trial judge sustained the defendants' objection to it. The suit record was then proffered. This record may be considered because it was properly introduced in evidence at the original trial. Cf. Caldwell v. Texas Industries, Inc., 441 So.2d 472 (La.App. 2nd Cir.1983). In any event, the record has some relevance on the issue of testamentary capacity and is admissible. La.R.S. 15:492.
[3] Mr. Pittman had also been Mr. Riggio's attorney in his 1973 suit against Little Pete.
[4] Apparently, this testimony was intended to give reliability to Mr. Riggio's deposition which conflicted with Peter's testimony at the trial. Mr. Higgins called Rose and Catherine on cross-examination.
[5] The record does not reveal the terms of the compromise.
[6] By the time this trial was held, Mr. Higgins had died and Peter and Little Pete were represented by Mr. Curtis M. Baham, Jr.
[7] The appellants do not contest the identity of the legatee in this appeal. The evidence clearly shows Little Pete is the legatee of the disposable portion. La.C.C. arts. 1714 and 1715; Succession of Baskin, 349 So.2d 931 (La.App. 1st Cir. 1977), writ denied, 350 So.2d 1211 (La.1977).
[8] At the retrial, appellants attempted to file in evidence the deposition of Peter taken on March 31, 1976, in Mrs. Riggio's succession. The district court sustained an objection to its admissibility, and it was proffered. This deposition is admissible for purposes of the collation claim as an admission. La.R.S. 15:449-450; D. Binder, The Hearsay Handbook, Exception 28, 316 (1975); McCormicks Handbook of the Law of Evidence, § 262, 628 (E. Cleary 2nd ed. 1972).
[9] See L. Oppenheim, Successions and Donations § 171 et seq. in 10 Louisiana Civil Law Treatise 282 (1973). Contra Succession of Dittmar, 458 So.2d 163 (La.App. 5th Cir.1984).
[10] Since the trial of this case, Peter, Anthony and Katie have died, and their heirs have been substituted as parties.