789 So.2d 1 (2000)
In the Matter of the SUCCESSION OF Lubertha D. BRANTLEY
No. 99 CA 2422.
Court of Appeal of Louisiana, First Circuit.
November 3, 2000.
Rehearing Denied December 29, 2000.
Writ Denied March 30, 2001.
Carey J. Messina, Todd A. Rossi, Jennifer J. Thomas, Baton Rouge, for Appellees Ruth B. Lloyd, Burnett Dyer, Lillian M. Birkett, Jacqueline D. Phelps, J.M. Dyer, Jean Dyer Patin, Lillian Patricia Potter, Carole Dyer Lewis-Grey, and Ericka P. McDaniel.
*2 A.P. Manint, Lorna M. Brasseaux, Baton Rouge, for Appellant Ardelia S. Clark.
Before: WHIPPLE, FOGG and BAGNERIS,[1] JJ.
BAGNERIS, Judge.
In this will contest, Ardelia S. Clark, niece of the decedent/testator, appeals from a judgment declaring null and void a statutory will. The trial court found that the testator, Lubertha D. Brantley, lacked the required testamentary capacity to confect a will at the time the will was confected. We affirm.

BACKGROUND FACTS
In 1987, Lubertha D. Brantley, an octogenarian, suffered a stroke. On or about February 10,1987, a petition to interdict Brantley was filed. By judgment dated April 1, 1987, Brantley was interdicted. Ardelia Clark was appointed the curatrix and Ruth Lloyd was the undercuratrix.
On May 4, 1988, Brantley filed an action to revoke the interdiction.[2] By judgment dated, October 28, 1988, the interdiction was revoked.[3] This judgment declared that Brantley was "fully competent now to take care of her person and to administer her estate" subject to the provisions of a trust agreement.[4]
Nearly five years later, on December 10, 1993, Brantley executed a statutory testament.[5] Brantley died on December 19, 1994, at the age of 92. A petition for probate of Brantley's statutory testament was filed by Clark[6], the alleged universal legatee under the last will and testament of Brantley.
After the filing of an opposition to the ex parte probate of the testament and other pleadings by various parties claiming an interest in the succession, Clark filed a "Petition for Declaratory Judgment" in the pending probate action. Clark sought a judicial determination that the April 1, 1987 interdiction of Brantley had been revoked by a judgment signed October 28, *3 1988; that the issue of the revocation of Brantley's interdiction was res judicata and not subject to attack by defendants; that all persons have capacity to make and receive donations mortis causa and inter vivos under LSA-C.C. art. 1470; that Brantley was entitled to the presumption of capacity under LSA-C.C. art. 1470; that under LSA-C.C. art. 1482, any person challenging a donor's capacity who is not under a judicial determination of mental infirmity must prove by clear and convincing evidence that the donor lacked capacity at the time he executed the testament; and that defendants, Ruth D. Lloyd, Burnett Dyer, Lillian M. Birkett, Jacqueline D. Phelps, J.M. Dyer, Jean Dyer Patin, Lillian Patricia Potter and Carole Dyer Lewis-Grey [the Lloyd heirs][7] bore the burden of proving by clear and convincing evidence that Brantley lacked capacity at the time the disputed testament was executed.[8] By judgment signed February 23, 1996, the trial court granted Clark's motion for summary judgment on the petition for declaratory judgment, and denied the Lloyd heirs' motion for summary judgment. The Lloyd heirs filed a petition for suspensive appeal, and by judgment rendered on June 29, 1997, this Court affirmed the trial court's judgment relative to the burden of proof.[9] However, no determination was made at that time regarding Brantley's capacity to execute her last will. This issue was left for resolution by the trial court.[10]
At the trial of this matter, the parties presented evidence of physicians who examined Brantley in 1987, 1988 and in early 1992 as evidence of Brantley's testamentary capacity.[11] In addition, the testimony of various friends and relatives who visited Brantley in years preceding her death was presented. The trial court also heard *4 from two sitters who were with Brantley before and after she executed her last will and testimony and from the notary and two witnesses to the testament.
The trial court determined that the Lloyd heirs had met their burden of proof regarding the lack of testamentary capacity of Brantley to confect a will and invalidated the will and ordered the matter to proceed as an intestate succession. Under this ruling, the nieces and nephews of Brantley, including Clark, will inherit her estate, rather than the entire estate falling to Clark. Clark has appealed, alleging the trial court erred in finding that the Lloyd heirs proved by clear and convincing evidence that Brantley lacked testamentary capacity at the time she executed her testament.

DISCUSSION

Testamentary Capacity
To make a valid donation mortis causa, a person must be of sound mind. La. C.C. art. 1477. The testamentary capacity to make a will is tested at the time the will is made. La. C.C. art. 1471; Stewart v. Branch, 250 So.2d 474, 477 (La.App. 1st Cir.), writ denied, 259 La. 905, 253 So.2d 224 (1971). Initially, it must be noted that testamentary capacity is solely a question of fact to be determined by the trial court and its finding will not be disturbed on appeal in the absence of manifest error. Succession of Christensen, 94-0263, p. 8 (La.App. 1st Cir.12/22/94), 649 So.2d 23, 27, writ denied, 95-0234 (La.4/7/95), 652 So.2d 1346; Succession of Keel, 442 So.2d 691, 692 (La.App. 1st Cir. 1983). With regard to the issue of capacity, there exists a presumption that the testator possessed the requisite testamentary capacity, which is only rebutted by satisfactory and convincing evidence. Succession of Bush, 292 So.2d 915, 917 (La. App. 1st Cir.), writ denied, 294 So.2d 837 (La.1974).
The question is whether the testator understood the nature of the testamentary act and appreciated its effects. Succession of Lyons, 452 So.2d 1161, 1164 (La.1984); Succession of Moody, 227 La. 609, 614, 80 So.2d 93, 94 (1955); Succession of Riggio, 468 So.2d 1279, 1288 (La. App. 1st Cir.), writ denied, 472 So.2d 33 (La.1985). The burden of proving lack of testamentary capacity is upon the party alleging it. Succession of Schmidt, 219 La. 675, 679-680, 53 So.2d 834, 835 (1951); Lyons, 452 So.2d at 1164; Riggio, 468 So.2d at 1288. There is a presumption in favor of testamentary capacity. Lyons, 452 So.2d at 1164; Succession of Mithoff, 168 La. 624, 122 So. 886 (La.1929); Riggio, 468 So.2d at 1288. This presumption continues until rebutted by clear and convincing evidence to the contrary. Lyons, 452 So.2d at 1165-66; Riggio, 468 So.2d at 1288.
What constitutes clear and convincing evidence is further explained in State v. Johnson, 458 So.2d 937, 942 (La.App. 1st Cir.1984), writ denied, 463 So.2d 593 (La. 1985), inter alia, as requiring more proof than a preponderance of the evidence but less stringent than the criminal standard of beyond a reasonable doubt.
The specific burden on the attacking party is to prove that at the time of execution the testator was not sufficiently sound of mind to fully understand the nature of the will and appreciate its effects. Succession of Brown, 251 So.2d 465, 467 (La.App. 1st Cir.1971). In determining testamentary capacity, the courts will consider the physical and mental condition of the testator not only at the time of execution, but also prior and subsequent thereto, since the actions, conduct and physical and mental condition of the testator before and after the execution of the *5 will are of probative value in deciding testamentary capacity. Id.
The trial court held that the evidence, particularly the testimony of physicians that Brantley was incapable of understanding and appreciating the properties she might own, was sufficient to support finding that Brantley lacked testamentary capacity at the time of the making of the 1993 will. The pertinent medical testimony at trial regarding Brantley's capacity was as follows:
Dr. Hypolite Landry, who had been appointed by the trial court to conduct an independent mental evaluation of Brantley, following the petition to revoke the interdiction, was the coroner of East Baton Rouge since 1972. He was appointed to numerous interdiction proceedings to determine an individual's ability to administer and manage their affairs. The former coroner testified that he was concerned about serious errors in judgment and, moreover, opined that others could take advantage of Brantley. Dr. Landry stated, "I believe anybody could take advantage of her really." He also concluded that Brantley was susceptible to influences by others. Dr. Landry was particularly concerned about family members exerting influence over Brantley and her financial decisions. He suggested in his May 11, 1988 report to the trial court in the Interdiction Proceedings that it would be advisable to have a nonfamily member such as a CPA or attorney appointed to manage Brantley's estate.
Dr. Landry found Brantley mentally incapacitated and unable to mange her finances. He opined that Brantley did not have the capacity to understand the nature or amount of her property. Dr. Landry testified that Brantley was unable to rationalize the value of her property. Brantley also did not have the capacity to manager her financial affairs. In Dr. Landry's report, he stated that it would be "catastrophe if she attempted to manage finances of this magnitude." Dr. Landry believed that Brantley would never be able to manage her estate. He also found that Brantley did not have the capacity, at that time, to execute a Last Will; nor would she ever have the capacity to execute a will.
Brantley's treating physician, Dr. Waguespack, also testified that Brantley was incapacitated before she executed the Will. Dr. Waguespack began treating Brantley in August 1980. He saw Brantley several times a year and cared for her when she had a stroke in January 1987. Dr. Waguespack stated in his deposition that, as early as December of 1990, Brantley's mental capacity was beginning to diminish as he was unable to get a medical history from her.
During Dr. Waguespack's last visit with Brantley in February of 1992, he diagnosed Brantley with "organic mental syndrome" which he defined as "her mind wasn't such that we could rationally converse and get a good history from her." He expected Brantley's mental capacity to get worse "because it had been getting worse for the last few years, and I would have expected that to continue."
Dr. Waguespack opined that as of February of 1992, Brantley did not have the ability to manage her financial affairs nor could she appreciate the properties and monies that she owned. He also stated that during the last visit he informed Brantley's sitter and niece (Clark) of the problems that Brantley was having, primarily that her mental status had changed.
Several friends and relatives of Brantley as well as the notary and witnesses to the will testified. Lucille Goudchaux, a childhood friend of Brantley, testified that the last time she visited with Brantley in 1993, *6 Brantley did not know who Goudchaux was and Brantley was unable to have a conversation. Goudchaux testified that after that visit she never went back to visit Brantley by herself because she "just couldn't stand to see her like she was."
Lillian Birkett was Brantley's niece and visited her frequently before Brantley's stroke, but less frequently after the stroke. Birkett testified that after the stroke, Brantley "was out of it all the time" and Brantley "didn't know who I was after the stroke." The stroke occurred on January 16, 1987. Birkett also stated that Brantley's condition "deteriorated" after the stroke and "she was just like a child." Birkett specifically recalled a visit right after Thanksgiving in 1993 in which Brantley "didn't know who I was" and was "just looking at me, staring at the wall as though no one was there."
Reverend Lionel Lee, Brantley's minister, testified that he had known her for more than thirty years. He witnessed Brantley's will in December, 1993. In his testimony, Lee stated that two or three years after Brantley's stroke, she became a "shut-in." He also acknowledged that when he would arrive at Brantley's home, he would always ask her if she knew who he was. Reverend Lee was called by his nephew, Mr. David Ferguson who was an attorney and notary, to act as a witness to Brantley's last will and testament.
Reverend Lee recalled going to Brantley's home to execute the will on two occasions. On the first occasion, Ferguson telephoned him to witness the will, but after his arrival, Ferguson said it would not be a good time to complete the document. Lee testified that "...she (Brantley) might be delirious and not knowing what she's doing. So he (Ferguson) backed out. He wouldn't do it." Lee further testified that Ferguson also said "it wouldn't be a good time to do it because he may have trouble in the future."
Ferguson admitted that he did not do any independent investigation to determine Brantley's mental capacity even though it was possible that he was aware at the time of the execution of the will that Brantley had been interdicted. Despite prior conversations with Brantley about the disposal of her estate, Ferguson did not question Brantley about leaving her entire estate to Clark, who was present at the execution of the will.[12] Nor did Ferguson read the entire will out loud or provide copies for either the witnesses or Brantley to follow along.
It is apparent from the foregoing that the trial judge was presented with diverse testimony. Our examination of the record and the testimony leads us to conclude that the trial judge did not commit manifest error in finding that the testator lacked testamentary capacity at the time of the making of the December 1993 will. The trial court's oral reasons specifically reference the opinions of the coroner, Dr. Landry, and Brantley's treating physician, Dr. Waguespack, as support for the finding of lack of capacity. In rendering his factual findings, the trial court recognized that these physicians testified that Brantley was incapable of understanding and appreciating the properties and monies she might own. Clearly, the trial court *7 found the testimony of medical experts and other evidence to be more credible than the conflicting lay opinions of appellant's witnesses. In light of its prior efforts to protect Brantley by revoking the interdiction and setting up the revocable trust, the trial court indicated that it felt it had been "gotten over:"
When this request to be out from under the interdiction came up, I couldn't figure out why it was going to happen that way. I was assured that if we put the money in trust, because I was concerned about the opinion of the coroner [Dr. Landry] and would have probably ordered another examination since there was some dispute over her [Brantley's] mental capacity, but I was assured if the funds were put in trust I would have nothing to worry about and that she wanted to be out from under interdiction for other reasons other than disposing of her funds. And then exactly what I was concerned about occurred.
In the instant case, the trial court found the evidence overwhelming that Brantley did not possess testamentary capacity at the time of making the December 1993 will. Testamentary capacity is solely a question of fact to be determined by the trial court and its finding should not be disturbed on appeal in the absence of manifest error. Succession of Keel, 442 So.2d at 691. When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; whence there is conflict in the testimony, reasonable evaluation of credibility and reasonable inferences of fact should not be disturbed upon review. Canter v. Koehring, 283 So.2d 716, 724 (La.1973). Given the testimony and evidence before the trial court we find no error in the trial court's determination that appellees successfully rebutted the presumption of testamentary capacity. The trial court correctly determined that Brantley lacked the requisite capacity to execute the statutory will.

CONCLUSION
For the foregoing reasons, the July 22, 1999 judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Ardelia S. Clark..
AFFIRMED.
NOTES
[1] Judge Michael G. Bagneris is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] This petition was apparently filed in response to the February 1, 1988 petition to remove Clark as curatrix, filed by the Lloyd heirs, alleging malfeasance on Clark's part.
[3] Dr. Hypolite Landry was appointed to conduct an independent mental evaluation of Brantley. By letter dated May 11, 1988, Dr. Landry concluded that Brantley was mentally incapacitated and unable to manage her finances.
[4] The trial court recognized that Brantley could not manage her affairs and that a mechanism was needed to control her assets. In an effort to find a way to economically and efficiently conserve the estate and protect the heirs and Brantley, the trial court "revoked" the interdiction and made it "subject to" Brantley losing all management and control over her assets as she was ordered to execute a trust immediately after the judgment revoking the interdiction was signed. The trustee had total control over her assets. To protect Brantley from herself and others, the trial court required any changes or modifications related to the management of Brantley's affairs and the disposition of her property to be monitored and approved by the court, only after contradictory hearing.
[5] Appellant, Clark, arranged for the execution of the Will and contacted her lawyer, Mr. David Ferguson, for assistance.
[6] Clark, the appellant, lived next door to Brantley. It is alleged that Clark continued to assist Brantley with her affairs after the revocation of the interdiction. Clark testified that she visited with Brantley several times a day and arranged for weekday and weekend sitters, assisted Brantley in paying her monthly bills, transported Brantley to church, accompanied Brantley to the physician's office and assured that all of Brantley's physical needs were met.
[7] Lillian M. Birkett, Jacqueline D. Phelps, J.M. Dyer, Jean Dyer Patin, Lillian Patricia Potter, Carole Dyer Lewis-Grey, and Burnett Dyer joined in the initial opposition to the probate of the testament filed by Ruth D. Lloyd. Erika P. McDaniel subsequently joined in the opposition as well.
[8] In proceedings bearing docket number 48163 of the docket of the 19th Judicial District, Parish of East Baton Rouge, Brantley was interdicted by judgment dated April 1, 1987, and Ardelia Clark was appointed curatrix. On February 2, 1988, the Lloyd heirs filed a petition for removal of curator and cancellation of bond. On May 4, 1988, a petition was filed on behalf of Brantley to revoke her interdiction. Dr. Hypolite Landry was appointed to conduct an independent mental evaluation of Brantley. By letter dated May 11, 1988, Dr. Landry concluded that Brantley was mentally incapacitated and unable to manage her finances. However, on October 28, 1988, the trial court rendered a judgment revoking the interdiction and directing cancellation of the inscription of the judgment of interdiction. The interdiction was revoked, per the terms of the judgment, "subject to the provision that the trust agreement, the proposed draft of which is annexed hereto as a part hereof, is executed by Mrs. Lubertha Dyer Brantley immediately after this judgment is signed, and such signed trust agreement is filed of record in the office of the Clerk of Court of East Baton Rouge, without delay, after its execution...." The "`revocable' trust agreement" was executed immediately after the judgment and was signed by Brantley.
[9] Succession of Brantley, 96 1307 (La.App. 1st Cir.6/20/97), 697 So.2d 16.
[10] Our earlier ruling provided, in pertinent part, "that the effect of our upholding the trial court's judgment herein does not preclude the Lloyd heirs from prevailing at trial; it merely shifts the burden of proof to them to establish Brantley's lack of capacity." Id. at 21.
[11] Medical testimony of Dr. Hypolite Landry and Dr. Waguespack, by deposition, was offered by the Lloyd heirs. Appellant, Clark, did not provide the trial court with any physician testimony with respect to Brantley's medical condition; instead, she offered a physician's written report rendered by Dr. Bret Burgoyne in 1987 that predated both the opinions of Dr. Waguespack and Dr. Landry.
[12] Clark and Ferguson both testified that Brantley stated before and after the execution of the will that she wanted to leave her house to her grand-niece, Fennel. Indeed Clark testified that Brantley "told me all along about the house, that she wanted Fannell to have the house." Clark also testified that Brantley said she wanted Rose to have an acre of land and Al Sanford to have some rental property she had. Ferguson testified, in part, that Brantley said "something about she did want, I think, Mrs. Clark's daughter [Fannell] to have her house, and Leo, something about him having something else."