MARION F. EDWARDS, Judge.
 

 12Sharon Blackmon appeals a judgment of the trial court in which the court denied her petition for declaratory judgment, found an olographic will to be invalid, and reinstated a prior notarial will confected by the decedent, Alex Gourgis. For reasons that follow, we affirm.
 

 FACTS
 

 In 1989, Alex Gourgis (“Mr.Gourgis”) confected a will in which he left his estate
 
 *530
 
 to his four remaining children,
 
 [1]
 
 subject to a usufruct in favor of his wife, Bernice Roche Gourgis.
 

 In 1993, Mr. Gourgis’ wife of fifty-six years died. Two years later, when he was seventy-five years old, Mr. Gourgis met Sharon Blackmon (“Blackmon”), a certified nursing assistant employed at the Mea-dowcrest Living Center. Blackmon was an attendant to Mr. Gourgis’ mother, who was a resident of the home. According to Blackmon, she and Mr. Gourgis began “dating” in 1995, although she admits that, in the ten years until his death in 2005, they actually went out only once or twice. Blackmon went to Mr. Gourgis’ home once or twice a week. She admits to having a sexual relationship with Mr. Gourgis.
 

 IsShortly after they met, Mr. Gourgis began helping Blackmon financially by paying her bills, including her car note, house note, and doctor bills. Mr. Gourgis also gave her some money for a down payment on a home and a car. Blackmon testified that Mr. Gourgis opened a bank account for her use “when she needed money.” Documents introduced show that Gourgis wrote regular checks to Black-mon, totaling $8,803.73, and made her a signatory on the bank account.
 

 In 2001, Mr. Gourgis established “The Alex J. Gourgis, Sr. Revocable Living Trust Agreement” (“The Trust”). The Trust document provided that each of Mr. Gourgis’ remaining four children held a one-fourth undivided interest in any of the “Settlor’s property not specifically designated to any other trust.” Mr. Gourgis made a donation of movable property, including vehicles and jewelry, to The Trust. He also made a donation of his undivided interest in certain immovable property.
 

 At the same time, Mr. Gourgis revoked the 1989 will and confected a new notarial will. In this 2001 will, Mr. Gourgis bequeathed his entire estate to The Trust.
 
 [2]
 
 Also in September of 2001, Mr. Gourgis granted medical power of attorney to his daughter, Jennifer G. Edwards (“Jennifer”). In a separate document, Mr. Gour-gis appointed Jennifer his Attorney-in-Fact and created a Mandate, which would become effective in the event of his incapacity as certified by two practicing physicians.
 

 Although the relationship between Mr. Gourgis and Blackmon had been ongoing for six years, Blackmon is not mentioned in either The Trust or the 2001 will. Further, Blackmon testified that Mr. Gourgis never told her about either The Trust or the new will. In
 
 2004,
 
 Mr. Gourgis took out a life insurance policy, making the Gourgis children beneficiaries.
 

 |4In 2005, Mr. Gourgis began to experience serious health issues. He was hospitalized for congestive heart failure and diagnosed with chronic renal failure. Further, he had an ablation procedure to treat a heart condition. His treating physician testified by disposition that Mr. Gourgis was on several medications that can have serious possible side effects including amnesia, lightheadedness, crying, nervousness, drowsiness, dizziness, depression, visual disturbances, temporary paralysis, loss of muscle control, personality loss or changes, disorientation, psychic derangements, mood swings and psychotic manifestations. However, the notations on the doctor’s records show that Mr. Gourgis was oriented. The doctor described Mr. Gourgis as a debilitated man with a caring family always around him. The family was always involved in medi
 
 *531
 
 cal decisions throughout Mr. Gourgis’ illness.
 

 On April 7, 2005, Mr. Gourgis was diagnosed with acute kidney failure. He died on May 17, 2005.
 

 According to Blackmon’s testimony, on the evening of April 16, 2005, she went to see that Mr. Gourgis was bathed and put to bed. Mr. Gourgis’ daughter, Jennifer, was in the kitchen fixing some food. Blackmon stated that Mr. Gourgis showed her a document he had written in which he asked his daughter, Jennifer, to “help Sharon Blackmon with a portion of my share ... I hope you will consider this.” Blackmon stated that when Jennifer came into the room and saw the document, she became upset and told her father that he was not dying and that therapy was going well. Jennifer handed the note back to Mr. Gourgis and returned to the kitchen.
 

 Jennifer denies ever seeing such a document or ever having a discussion with her father relating to giving anything to Black-mon upon Mr. Gourgis’ demise.
 

 IsBlackmon testified that, after Jennifer fed her father and left, Blackmon had a discussion with Mr. Gourgis in which she told him she didn’t think the will would be valid because he did not specify the amount of the portion he wished to give her. After dinner, Mr. Gourgis began to write something else on the note pad. Blackmon did not see what he was writing. However, he later showed her a second document. Mr. Gourgis asked Blackmon if that was alright. She said yes. Mr. Gour-gis instructed Blackmon to take it to a notary, make copies, and put it into his safe. Blackmon took the document to a notary, but the notary explained to her that she could not get it notarized without Mr. Gourgis present.
 

 The handwritten document, dated April 16, 2005 reads:
 

 To Jennifer and to all whom it may concern Jennifer if something should happen to me. [sic] As a last will and testament I would like Sharon n[sic] Blackmon to get a portion of my share something like 25/00 she been [sic] a dedicated friend for the last 10 yrs, and I feel to [sic] believed [sic] she derserve [sic] something.
 

 On June 1, 2006, Blackmon filed a petition to probate the above olographic will in the Succession of Alex J. Gourgis, Sr. who died on May 17, 2005. An order was signed by the trial court on the same day dispensing with the proses verbal and ordering the testament be recorded, filed, and executed in accordance with its terms.
 

 On October 10, 2006, Blackmon, as executrix of the will, filed a “Petition for Declaratory Judgment and to Recover Assets,” in which she named the decedent’s four major children (the Gourgis children) as defendants. In that petition, Blackmon seeks a modification of The Trust to name her as a beneficiary of 25 percent of the assets of The Trust. Further, Blackmon alleges that there is a bank account in the decedent’s name at | (¡Iberia Bank with a balance of $29,201.23 that does not belong to The Trust. Blackmon also seeks 25 percent of that bank account.
 

 The Gourgis children filed an answer and general denial in which they argued that all of decedent’s assets were transferred into The Trust at the time of his death and that the purported testament is vague and ambiguous and does not state that petitioner is to receive 25 percent of the estate. They argue that the document could be interpreted to bequeath $0.25 to Blackmon.
 

 In a supplemental and amending petition, the Gourgis children allege that decedent created a revocable trust before he died and funded it with all of his assets including any bank accounts in his name.
 
 *532
 
 The Gourgis children also assert that their father was physically and mentally incapable of writing the will in his own handwriting, or of comprehending the consequences of making a bequest on the date the purported will was dated. The Gourgis children also claim the will is invalid because of the undue influence of Blackmon.
 

 The matter went to trial on the merits after which the trial court rendered the judgment at issue in this appeal. The judgment is supported by written Reasons that show the trial court found Blackmon to be a non-credible witness. The court further found that:
 

 The purported olographic will does not modify The Trust pursuant to R.S. 9:2051 A, nor is it a testament pursuant to R.S. 9:2051 B. Even assuming that it was an ambiguous attempt to modify The Trust, it did not comply with the requirements and formalities for modification required by law. Moreover, on its face, it is not a valid will because it is ambiguous, does not make a valid deposition of deceased’s property, and was obtained by the undue influence of Ms. Blackmon through sexual favors, drugs and pressure.
 

 17Accordingly, the trial court denied Black-mon’s petition for declaratory judgment, invalidated, annulled and set aside the olo-graphic will, and ordered that the prior notarial will be given the effect of probate.
 

 In brief to this Court, Blackmon argues that the Gourgis children did not show, by clear and convincing evidence, that undue influence was exerted upon Mr. Gourgis. In a second assignment of error, Blackmon argues the olographic testament modified The Trust.
 

 LAW
 

 Upon review, we agree with the trial court that The Trust was not affected by the purported olographic testament presented by Blackmon for probate. The terms of The Trust document executed in 2001 are clear that decedent bequeathed his entire estate to The Trust, including any bank accounts in his name. Blackmon does not contest the validity of The Trust; rather, she argues the olographic testament modified The Trust to bequeath one-fourth of it to her. We disagree.
 

 Mr. Gourgis set up The Trust in accordance with LSA-R.S. 9:1721 et seq.
 
 [3]
 
 The Louisiana Trust Code defines a trust as “the relationship resulting from the transfer of title to property to a person to be administered by him as a fiduciary for the benefit of another.”
 
 [4]
 
 Inherent within this body of law is the concept of trust indestructibility and the protection of the trust instrument from any modification or termination contrary to the settlor’s clearly expressed intent.
 
 [5]
 

 The settlor may modify the terms of the trust after its creation only to the extent he expressly reserves the right to do so.
 
 [6]
 
 The Trust agreement provides that Mr. Gourgis could, during his life, revoke or amend the provisions of The Trust. A | Strust document can be modified, terminated, or revoked by authentic act or by testament.
 
 [7]
 

 
 *533
 
 The purported olographic testament does not mention The Trust, nor does it mention or revoke the 2001 notarial will. Further, it is ambiguous. It states merely that, “I would like Sharon n[sic] Blackmon to get a portion of my share
 
 something like
 
 25/00.”
 
 [8]
 

 Besides the requirements that an olographic will be completely handwritten, signed, and dated by the testator,
 
 [9]
 
 the document itself must evidence testamentary intent to be a valid testament.
 
 [10]
 
 In the absence of a testamentary intent, there cannot be a will. Furthermore, such intent must exist when the instrument is executed and must apply to the particular instrument produced as a will.
 
 [11]
 

 In the document before us, there is no mention of an intent to revoke the prior will, The Trust, or to modify The Trust. We believe the language of this document simply evidences a request by Mr. Gourgis to his daughter, Jennifer, to give Black-mon “something,” because “she derserve [sic] something.”
 

 Accordingly, we find the purported olo-graphic will did not alter or modify the 2001 will or The Trust. Further, it does not evidence testamentary intent. Even if the document was valid as an olographic will, it has no legal effect since, without modification of The Trust or revocation of the 2001 will, all of Mr. Gourgis’ estate |9was placed in The Trust at his death, thereby leaving nothing for Blackmon to inherit.
 

 Blackmon also argues the trial court erred in invalidating the will because of undue influence and incapacity.
 

 A donation
 
 mortis causa
 
 shall be declared null upon proof that it was the product of influence by the donee or another person “that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor.”
 
 [12]
 
 However, this article assumes the donor has capacity.
 
 [13]
 
 Thus, if a person lacks capacity, the entire donation is invalid for that reason alone and there is no need to consider the issues of undue influence.
 
 [14]
 

 A person must be able to comprehend generally the nature and consequences of the disposition that he is making in order to have capacity to make a donation
 
 mortis causa.
 

 [15]
 

 This capacity must exist at the time the testator executes the testament.
 
 [16]
 
 With regard to the issue of capacity, there exists a presumption that the testator possessed the requisite testamentary capacity, which is only rebutted by satisfactory and convincing ev
 
 *534
 
 idence.
 
 [17]
 
 Clear and convincing proof has been defined as more proof than a preponderance of the evidence but less stringent than the criminal standard of beyond a reasonable doubt.
 
 [18]
 

 The consideration of whether a testator had capacity at the time of execution
 
 of
 
 the testament is a fact intensive issue. Our review of the findings of fact on the issue of whether a donor had the capacity to make a donation
 
 mortis causa
 
 will not be disturbed on appeal unless clearly
 
 wrong or
 
 manifestly erroneous.
 
 [19]
 

 |inIn the matter before us, it is clear from the Reasons for Judgment that the trial court did not find Blackmon to be a credible witness. Issues of credibility are within the domain of the trier of fact. When factual findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard of review demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.
 
 [20]
 

 Here, the trial court reviewed the documents executed by Mr. Gourgis in 2001, six years after he met Blackmon, and found that Mr. Gourgis was an intelligent man who developed and put into effect a planned distribution of his estate. Mr. Gourgis formed a revocable trust in which he placed all of his property at his death. He executed a will and powers of attorney for medical and general purposes. All of the documents make it clear that he fully intended to divide his property among his four children. None of these documents mention Blackmon.
 

 There is testimony from Mr. Gourgis’ family and his doctor that, at the time the olographic will was written, Mr. Gourgis was incapacitated. The affidavit of Dr. Michael McSween (“Dr.McSween”), decedent’s physician, establishes that, at the time the document was written, Mr. Gour-gis was taking several medications which
 

 have serious possible side effects including amnesia (memory loss), light-head-edness, crying, nervousness, drowsiness, dizziness, depression, visual disturbances, temporary paralysis, loss of muscle control, personality loss or changes, disorientation, psychic de-rangements, mood swings, and psychotic manifestations.
 

 Dr. McSween also explained in his testimony and in his affidavit that Mr. Gourgis was suffering from acute kidney failure and the downward progression of his lnhealth was “rapid and severe.” Dr. McSween last saw Mr. Gourgis on April 7, 2005. Dr. McSween described Mr. Gour-gis as “seriously physically impaired on April 7, 2005.” Dr. McSween opined that:
 

 based on the foregoing and my training, education and experience, it is my professional opinion that Mr. Gourgis was so severely physically impaired when I saw him on April 7, 2005, and taking numerous medications, that he could not reasonably be expected to understand the terms and conditions of any legal document, in particular a last will and testament executed several days later on April 16, 2005.
 

 Given the facts of this case, Mr. Gourgis did not have capacity to execute the pur
 
 *535
 
 ported olographic will. Accordingly, a discussion of undue influence is irrelevant. Further, we find no manifest error in the trial court’s finding that the olographic will is invalid. Accordingly, we affirm the judgment of the trial court.
 

 AFFIRMED.
 

 [1]
 

 . Mr. Gourgis had five children, but one predeceased him.
 

 [2]
 

 . The will also contained certain special dispositions in favor of his daughters.
 

 [3]
 

 . The Louisiana Trust Code.
 

 [4]
 

 . LSA-R.S. 9:1731.
 

 [5]
 

 .
 
 Albritton v. Albritton,
 
 600 So.2d 1328, 1332 (La.1992) (citing
 
 Richards v. Richards,
 
 408 So.2d 1209 (La.1981)).
 

 [6]
 

 . LSA-R.S. 9:2021.
 

 [7]
 

 .LSA-R.S. 9:2051 provides:
 

 A. A modification, division, termination, or revocation of a trust shall be by authentic act or by act under private signature executed in the presence of two witnesses and duly acknowledged by the person who makes the modification, division, or termination or by the affidavit of one of the attesting witnesses. The modification, divi
 
 *533
 
 sion, termination, or revocation is not effective as to a trustee until a copy of the authentic act or a copy of the acknowledged act is received by him.
 

 B. A modification, division, termination, or revocation of a trust may also be by testament. Such a modification, division, termination, or revocation is not effective as to a trustee until the trustee receives a copy of the testament and of the order probating it or ordering it filed and executed.
 

 [8]
 

 . (Emphasis added).
 

 [9]
 

 . LSA-C.C. art. 1575.
 

 [10]
 

 .
 
 In re Succession of Rhodes,
 
 39,364 (La.App. 2 Cir. 3/23/05), 899 So.2d 658, 660,
 
 wnt denied,
 
 2005-0936 (La.6/3/05), 903 So.2d 459.
 

 [11]
 

 .
 
 Id.
 

 [12]
 

 . LSA-C.C. art. 1479.
 

 [13]
 

 .
 
 See,
 
 LSA-C.C. art. 1479 comment (b).
 

 [14]
 

 .
 
 Id.
 

 [15]
 

 . LSA-C.C. art. 1477.
 

 [16]
 

 . LSA-C.C. art. 1471.
 

 [17]
 

 .
 
 In re Succession of Brantley,
 
 1999-2422 (La.App. 1 Cir. 11/3/00), 789 So.2d 1,
 
 writ denied,
 
 01-295 (La.3/30/01) 788 So.2d 1192.
 

 [18]
 

 .
 
 Id.
 

 [19]
 

 .
 
 Id.
 

 [20]
 

 .
 
 Dufresne v. Dufresne,
 
 08-215 (La.App. 5 Cir. 9/16/08), 992 So.2d 579.