THERIOT, J.
|2The administrator of the estate of Richmon Troy Wesley, Milton Bendily, Jr., appeals the judgment of the Twenty-first Judicial District Court that declared the decedent’s last will and testament null and void. For the following reasons, we reverse the judgment of the trial court.
FACTS AND PROCEDURAL HISTORY
The decedent, Richmon Troy Wesley (“Ricky”), died in Walker, Louisiana on October 12, 2011. He was survived by his wife, Becky Leonard Wesley (“Becky”), with whom he had no children.[1] Ricky had no other children, but did have two surviving siblings, Randall Wesley (“Randy”) and Kimberlon Wesley Hodgeson (“Kim”), the appellee in the instant case.
Ricky was diagnosed with colon cancer in October of 2010. On April 15, 2011, Ricky executed a notarial last will and testament (“will”), in which he made several specific legacies to various relatives and friends, and named Becky as the heir of the remainder of his estate. The remainder of the estate was of a considerable value, as it consisted of Ricky’s interest in properties and businesses owned by the three Wesley siblings. His best friend Milton Bendily, Jr. (Milton) was appointed administrator of the estate. Both Randy and Kim were excluded from their brother’s will.
On October 21, 2011, Becky and Milton filed a petition to execute Ricky’s will and have Milton appointed as executor. On June 25, 2012, Kim filed a petition to annul the last will and testament and appointment of independent testamentary executor.
A trial on the petition to annul was held on November 22, 2013. Kim presented three witnesses, namely: herself, Randy, and Dr. Alfredo Suarez. | aMilton presented six witnesses, namely: himself, Tam-berlyn Bendily, Becky, Barbara Gatewood, Mary Heck Barrios and Dr. Richard Byrd (via deposition).
Randy and Kim testified that they had both been estranged from their younger brother Ricky for some time prior to his death. Kim detailed a physical altercation between Ricky and herself in 1996, after which she stated their relationship changed to “cordial.” Kim stated that Ricky did not inform her that he was diagnosed with colon cancer in October 2010. She- found out in April 2011, through Ricky’s attorney who called her and said Ricky was in the hospital; Randy also testified that he was not close to Ricky. The relationship between Randy and Ricky deteriorated after Ricky filed a lawsuit against Randy seeking to nullify or rescind the act of contribution whereby all the properties co-owned by the siblings' were divided into separate limited liability companies. Ricky alleged that he was unfairly compensated by the land deal and was confused about the documents when he signed them.[2]
From ’ October 2010 to October 2011, Randy’s and Kim’s personal contact with Ricky was very limited. Kim recalled seeing Ricky in the hospital in August of 2011, and occasionally on the property they co-owned. However, it is clear that she did not have personal contact with Ricky on or around April 15, 2011, when Ricky execut *26 ed his will. Randy testified he probably saw Ricky twice between October 2010 and 2011. The first time was during a deposition, and the second time was on property owned by the family in Walker. Randy testified that he did not have personal contact with Ricky on or around April 15, 2011.
|4To prove Ricky’s lack of testamentary capacity, Kim called Dr. Alfredo Suarez, deputy coroner for the East Baton Rouge Parish Coroner’s Office, as an expert in forensic pathology. The court conducted a Daubert[3] hearing before qualifying Dr. Suarez to testify as to the effects certain narcotics have on the human body based on the record of prescribed dosage.
Dr. Suarez testified that he had never met Ricky. Dr. Suarez testified that he reviewed Ricky’s pharmaceutical and medical records and saw that Ricky had been prescribed medication that contain the narcotic drugs hydrocodone and alprazo-lam and that Ricky was prescribed to take those drugs on April 15, 2011. Dr. Suarez admitted, however, that he had no personal knowledge as to whether Ricky actually consumed those drugs on April 15, 2011, or on any date prior to April 15, 2011.
Dr. Suarez opined that based on Ricky’s pharmaceutical records that Ricky might have taken forty hydrocodone pills between April 4, 2011 and April 15, 2011. Dr. Suarez discussed the various effects of hydrocodone on the body, including drowsiness, mental cloudiness, and impairment of mental and physical performance. He stated that he knew of these symptoms from literature published by the pharmaceutical company that manufactured the drug. Dr. Suarez classified the taking of forty hydrocodone pills in 11 days as abuse, and that if Ricky was taking hydro-codone in that amount at that time, then Ricky “had to have been drowsy.” Dr. Suarez also stated, “If [Ricky] was taking that many pills in a short period of time ... my opinion is that he will probably be with a cloudy mind. In other words, he didn’t know what he was doing.” Dr. Suarez admitted, however, that he could not know which side effects, if any, Ricky |ficould have experienced. Dr. Suarez also admitted that he could not find any record of Ricky being prescribed alprazolam on or prior to April 15, 2011.
Tamberlyn Bendily, Milton’s wife, testified that she knew Ricky since high school. She testified that she would see Ricky at least weekly during the last two to three years of his life. At no time during her discussions with Ricky did Tamberlyn believe Ricky was confused or had difficulty in understanding what he was doing. She testified Ricky delivered his will to her for safekeeping. Tamberlyn believed Ricky delivered the will to her the same day it was executed, but she was- not certain it was delivered the same day. She testified Ricky was “perfectly fine” on the day he delivered the will to her.
Milton also testified at trial. He testified that he was aware of Ricky’s intent to draft a will for one or two months prior to it being drafted. Milton testified he would see Ricky at least a couple of times a week during 2011, and never noticed any signs of confusion. Milton testified that he witnessed no lack of understanding in Ricky with respect to his will or his health conditions and that Ricky was able to make decisions regarding both on his own. Milton testified that Becky did not view the will until after Ricky’s death.
*27 Barbara Gatewood, Ricky’s aunt, testified that she saw Ricky at least on a weekly basis. She stated Ricky never showed signs of incompetence.
Mary Heck Barrios, the attorney who drafted the will, testified. It was stipulated that Ms. Barrios has practiced law for over thirty years. She testified that Ricky first broached the subject of a will at the end of the summer of 2010. Ms. Barrios further testified in detail regarding several conversations she had with Ricky regarding his last will and testament and that at no time did Ricky appear confused. Ms. Barrios explained how | fiRicky, like other clients, filled out a ten-page questionnaire prior to the will being drafted. Several days prior to executing the will, Ricky delivered the questionnaire to her office and discussed the contents with Ms. Barrios. On the day the will was executed, Ms. Barrios testified she spent approximately forty-five minutes with Ricky. At no point during any of her conversations with Ricky did Ricky appear confused.
Ricky’s wife Becky testified at trial. She stated that she observed Ricky daily from April 4, 2011 to April 15, 2011. When asked if he had been “acting funny” during that time, she replied that he was not. She also testified that she believed he was not abusing his medication. Although she did not recall the exact date that Ricky executed his will, she recalled being with him on that day and that he had discussed with her previously that he wanted to have a will drafted. She did not accompany him to the law office when the will was executed. Becky testified that when Ricky expressed his intention to draft a will, he did not exhibit any loss of concentration or confusion as to his identity or where he was. Becky also stated that she did not see Ricky’s will prior to his death. Becky admitted to being convicted of theft, which involved the unauthorized use of a credit card belonging to Ricky’s mother when the mother was alive.
Dr. Byrd’s deposition was introduced into the record in lieu of his appearance. Dr. Byrd is a colorectal specialist. He was Ricky’s treating physician. Dr. Byrd testified he had two personal contacts with Ricky prior to the will being executed. The first visit was on January 11, 2011. Dr. Byrd stated Ricky was not mentally impaired on that date. According to his notes, Dr. Byrd testified that Ricky was not mentally impaired on the April 4, 2011 visit. Dr; Byrd next visited with Ricky at the hospital on April 23, 2011. He testified he had no reason to believe that Ricky was not capable of |7giving consent for the April 23, 2011 surgery. Dr. Byrd testified there was nothing in his records or his memory to indicate that Ricky could not have freely executed his will on April 15, 2011.
At the close of testimony, the trial court, in lieu of closing argument, left the record open to allow counsel to submit their closing in the form of findings of fact and conclusions of law. After taking the matter under advisement, the trial court signed a judgment on March 24, 2014 decreeing the April 15, 2011 last will and testament to be “null and void”. Milton, as administrator of Ricky’s estate, appealed the trial court’s judgment nullifying the testament.
ASSIGNMENTS OF ERROR
Milton asserts three assignments of error: [4]
*28 1. The court erred in allowing Alfredo Suarez, M.D., to testify at the trial, as he had no personal knowledge of any facts pertinent to the issues presented and should not have been qualified as an expert witness.
2. The court erred in determining that Kim met her burden of proof, by clear and convincing evidence, that the decedent lacked the necessary testamentary capacity to execute his will on April 15, 2011.
3. The court erred in failing to grant sufficient weight to the opinion of the decedent’s treating physician that the decedent possessed the necessary mental capacity to execute his will on April 15, 2011.
STANDARD OF REVIEW
The issue of testamentary capacity is factual in nature. In re Succession of Brantley, 99-2422, p. 5 (La.App. 1 Cir. 11/3/00), 789 So.2d 1, 4, writ denied, 01-0295 (La.3/30/01), 788 So.2d 1192. In re Succession of Barattini, 11-752, p. 7 (La.App. 5 Cir. 3/27/12), 91 So.3d 1091, 1095. Courts of appeal review of the trial court’s findings of fact on the issue of whether a donor had the capacity to make a donation mortis causa will not be disturbed on appeal unless clearly wrong or manifestly erroneous. Succession of Gourgis, 08-430, p. 9 (La.App. 5 Cir. 11/12/08), 1 So.3d 528, 534, writ denied, 08-2902 (La.2/13/09), 999 So.2d 1147, See also, In re Succession of Dodson, 38,188, p. 4 (La.App. 2 Cir. 3/3/04), 867 So.2d 921, 924.
In applying this standard of review, the issue to be resolved is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Stobart v. State, through Dep’t. of Transp. and Dev., 617 So.2d 880, 882 (La.1993). If the trial court’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse those findings even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Hulsey v. Sears, Roebuck & Co., 96-2704, p. 5 (La.App. 1 Cir. 12/29/97), 705 So.2d 1173, 1176-77.
THE REASONS FOR JUDGMENT
We first note that the trial court’s reasons for judgment signed on January 13, 2014, state:
The Court considered the credibility of all witnesses and evidence presented, as well as depositions filed in the record, and left the record open for counsel to submit their closing arguments in the form of post-trial memoranda.
The Court having considered all testimony, evidence, and memoranda provided adopts the arguments as outlined in the memorandum submitted by The Mack Law Firm.
A Judgment in accordance with the above reasons will be signed upon submission.
[[Image here]]
IsAs this court stated in Miller v. Smith, 391 So.2d 1263, 1265 (La.App. 1 Cir.1980), writ granted, 396 So.2d 919 (La.1981), affirmed on other grounds, 402 So.2d 688 (La.1981):
When a trial judge has provided no reasons for judgment, a reviewing court must divine them. When reasons are provided, a reviewing court must be assured that the thinking process was that of the judge and not an advocate in the *29 lawsuit. It is one thing for victorious counsel to prepare a judgment comprised of the stark, final determinations of a case. It is quite another for' counsel to present as the inner thoughts of a judge what amounts to a well-written brief.
In the present case, the reasons for judgment are counsel’s, not the judge’s. Counsel, in brief, repeatedly cites his own written reasons, a highly self-serving act. Contrary to our general practice, we cannot place any real value on the written reasons presented.
This is particularly true in the present case where the trial court adopts as its written reasons the argument of counsel as outlined in a post-trial memorandum. When a trial court adopts as its reasons the post-trial memorandum submitted by counsel, who is clearly advocating on behalf of his client, a reviewing court is deprived of knowing the thought process of the trial judge. See Id. This is particularly troublesome in a case such as the one before us where the issue of testamentary capacity is so factual in nature. Nevertheless, we will use the memorandum as the trial court’s reasons since it is the only reasons for judgment in the record, but we will view it with a jaundiced eye. See State, Dept. of Transp. and Dev. v. August Christina & Brothers, Inc., 97-244, p. 8 (La.App. 5 Cir. 2/11/98), 716 So.2d 372, 377.
DISCUSSION
We will first address the argument raised by Milton that the trial court erred in determining that the appellee met her burden of proving, by clear 110and convincing evidence, that the decedent lacked the necessary testamentary capacity to execute his will on April 15, 2011.
Testamentary Capacity
[[Image here]]
There is a presumption in favor of testamentary capacity. A person who challenges the capacity of a donor must prove by clear, and convincing evidence that the donor lacked capacity at the time the donor executed the testament. To prove a matter by clear and convincing evidence means to demonstrate that the. existence of a fact is highly probable, that is, much more probable than its nonexistence.
In re Succession of Fisher, 06-2493, p. 9 (La.App. 1 Cir. 9/19/07), 970 So.2d 1048, 1054. (Citations omitted). If a donor lacks capacity, then the entire donation or will is invalid for .that reason alone, and issues of fraud and undue influence are irrelevant. La. C.C. art. 1479, comment (b); Fisher, 06-2493 at p. 12 n. 6, 970 So.2d at 1056 n. 6.
All persons have capacity to make and receive donations mortis causa, except as expressly provided by law. La. C.C. art. 1470. Using the standard put forth in Fisher, Ricky could only be found to have lacked capacity to execute a will through clear and convincing evidence. Clear and convincing evidence requires more proof than a “preponderance of evidence”, but less proof than “beyond a reasonable doubt.” Burmaster v. Plaquemines Parish Government, 07-2432, p. 18 (La.5/21/08), 982 So.2d 795, 809.
The testimony of Kim and Randy basically discussed the strained relationship they had with their brother. Testimony was elicited regarding the allegations raised, by Ricky in his lawsuit against his brother. According to the testimony, Ricky was attempting to annul and rescind an act of contribution on the basis that he, Ricky, did not understand the transaction or was subject to undue influence. The *30 record is void of any evidence that the allegations made by Ricky in the lawsuit were ever proven or disproven in a | ncourt of law. Furthermore, Ricky’s allegations were referring to a period of time prior to February of 2010. The will in question was executed on April 15, 2011, over a year after the allegations were made. Kim and Randy’s testimony does not provide any insight to Ricky’s mental state as of April of 2011.
Dr. Suarez, admitted as an expert witness in the field of forensic pathology, testified. The following exchange is illustrative of Dr. Suarez’s testimony.
Q. If I understood your testimony correctly, Dr. Suarez, you felt that or were you offering an opinion that [Ricky] was experiencing drowsiness between April 4 and April 15, 2011?
A. Well, if he was taking hydrocodone at that level, he had to have been drowsy.
Q. And upon what do you base that opinion?
A. Because of the side effects of hydro-codone.
Q. Is it your testimony today that you profess that every side effect that is listed on one of those inserts is experienced by every person who takes the drug?
A. That’s an overall, they apparently ran a survey and they list the most common side effects. So they don’t mention the percentage of individuals who experience any of those bad side effects.
Q. My question was, is it your testimony today that anyone who takes the drugs will experience all of the side effects that are listed on that insert?
A. Not all of them. Like I mentioned, it’s a percentage. They don’t mention whether it’s ten percent here, thirty percent there, or forty percent there which are the common ones. But those are the side effects that have been seen or reported to the manufacturer by patients.
Q. So upon what do you feel you can base an opinion as to which of those particular side effects [Ricky] was experiencing?
A. I don’t know.
112Pr. Suarez applied no methodology in reaching his conclusions. Dr. Suarez’s testimony is mere speculation of what Ricky’s mental state may have been assuming Ricky had taken forty pills of his prescribed medication within eleven days and assuming Ricky had suffered the side effects listed on the warning labels of the prescription drugs. Dr. Suarez’s conclusions were based on assumptions not substantiated by any factual witness. In fact, Dr. Suarez admitted that he had no personal knowledge as to whether Ricky actually consumed the prescription drugs on April 15, 2011, or on any date prior to the execution of the will. Dr. Suarez simply read the possible side effects of the drug from an insert provided by the manufacturer that was included with the medication, and repeated those side effects in open court.
After a review of all the evidence in the record, we find that the burden was not met proving that Ricky lacked capacity to execute his will. Ricky’s siblings did not have personal contact with Ricky during the month of April of 2011, and they could not testify as to Ricky’s state of mind during that time period. The evidence produced by Kim does not refute the observations of Dr. Byrd, Becky, Milton, Ms. Barrios and Tamberlyn, all of whom had personal contact with Ricky either right before, right after, or on the day Ricky executed his will.
*31 We note the trial court erred in its adopted reasons when it attributed to Dr. Byrd a statement made by Dr. Greg Hen-kelmann, a radiologist. Dr. Byrd never stated “The patient is extremely nervous about his recent diagnosis, and sometimes it is hard for him to focus on the questions.” That observation is found in the January 25, 2011 Radiation Therapy Initial Consultation report dictated by Dr. Hen-kelmann. To the contrary, Dr. Byrd, Ricky’s treating physician, clearly testified that Ricky did not lack the capacity to execute a will on April 15, 2011. We further note that Dr. | ]SHenkeImann mentioned on the last page of the January 25, 2011 report that “the patient has signed a site specific consent form and all questions were answered.”
There is ample testimony that Ricky did not appear incapacitated either on or near April 15, 2011. Assuming the trial court did not believe Becky, Dr. Suarez’s assumptions do not rise to the level of clear and convincing evidence when one considers Ricky’s medical records and the testimony of Dr. Byrd (Ricky’s treating physician), Tamberlyn, Milton, and Ms. Barrios (the attorney who executed the will).
The evidence put forth by Kim is circumstantial at best. We find that the trial court clearly erred in finding the evidence was sufficient to meet the clear and convincing standard that Ricky lacked the capacity to execute a will on April 15, 2011. No evidence was put forth as to whether Ricky was unduly influenced to execute the will; therefore, that claim falls as well.
DECREE
Based on the evidence submitted at trial, we find that the appellee, Kimberlon Wesley Hodgeson, faded to meet the burden of clear and convincing evidence to prove that the decedent lacked capacity to execute his will or was unduly influenced in the execution of the will. As such, the finding that Richmon Troy Wesley lacked testamentary capacity is reversed and the judgment of the trial court is vacated. Judgment is rendered for appellant, Milton Bendily, Jr., finding Richmon Troy Wesley had the testamentary capacity to execute his last will and testament dated April 15, 2011, and further finding Richmon Troy Wesley was not unduly influenced.[5] The case is remanded to the trial court for further proceedings consistent 114with this opinion. All costs in conjunction with this appeal are assessed to the appellee, Kim-berlon Wesley Hodgeson.
REVERSED, VACATED, RENDERED AND REMANDED.
GUIDRY, J., concurs.

. Ricky and Becky had been living together since 2004. They were married on October 8, 2011, four days before Ricky died.

. The underlying lawsuit is titled Richmon Troy Wesley v. Randall McCall Wesley and Wesley Family Estate, LLC, No. 587127, 19th .Judicial District Court, Parish of East Baton Rouge.

. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. Originally there were four assignments of error. Assignment # 4 pertained to the appeal bond set by the trial court. However, on January, 16, 2015, the record was supplemented with a January 7, 2015 trial court order converting the motion for suspensive *28 appeal to a motion for a devolutive appeal. Thus, an appeal bond is no longer necessary. As such, the issue of the excessiveness of the appeal bond is moot and will not be discussed in this opinion.

. Consideration of assignments of error No. 1 and No. 3 are mooted based on our determination that the trial court erred in finding that the appellee met her burden of proving, by clear and convincing evidence, that the decedent lacked testamentary capacity to execute his last will and testament dated April 15, 2011.