970 So.2d 1048 (2007)
SUCCESSION OF Vera Ferguson FISHER.
No. 2006 CA 2493.
Court of Appeal of Louisiana, First Circuit.
September 19, 2007.
*1049 Mark R. Callender, Baton Rouge, Counsel for Plaintiffs/Appellants Guy Bruno, Jr., Charles H. Fisher, Christian Kijora as the Successor of Mary Ann Kijora, John Robert Fisher, J.W. Bruno, Margaurite Brueck, and Carl Glen Ferguson.
Linda S. Melancon, Prairieville, Counsel for Defendants/Appellees Plaine Toups, Priscilla Newman, Laverne Parnell, Juanita Barbay, Huey Simms, and Lee Gilchrist.
*1050 Dana K. Larpenter, Plaquemine, Counsel for Defendant Masonic Lodge of Plaquemine.
Paul Borron, III, Plaquemine, Counsel for Defendant First Methodist Church.
Before: GAIDRY, McDONALD, and McCLENDON, JJ.
McCLENDON, J.
Plaintiffs appeal a summary judgment rendered in favor of defendants dismissing their petition to annul a testator's will due to lack of testamentary capacity and undue influence. For the reasons that follow, we reverse the judgment and remand the matter to the trial court for further proceedings.

FACTUAL AND PROCEDURAL HISTORY
The Fishers were an elderly married couple who had no children. Their closest living relatives primarily consisted of various nieces and nephews who visited them often. In April 1986, Mrs. Fisher executed her will. Therein, she bequeathed her entire estate to her husband; however, in the event he predeceased her, her estate was to be divided among various family members, including certain nieces and nephews.
In 1999, the Fishers hired Elaine Toups. Initially, Ms. Toups' job was to prepare meals and run errands for the Fishers. However, following the recurrence of Mr. Fisher's cancer, Ms. Toups ultimately became the Fishers' paid caregiver/sitter and routinely stayed overnight in their home.
On April 12, 2000, Mrs. Fisher executed a new will. Therein, she again manifested her desire to leave her entire estate to her husband. However, in the event he predeceased her, she bequeathed her home to her nephew, Guy Bruno, Jr., $25,000 to her church, and $25,000 to Ms. Toups. Subject to these particular legacies, the remainder of her estate was to be divided among the Fishers' nieces and nephews.
On April 25, 2002, the Fishers executed reciprocal wills wherein each bequeathed their entire estate to the other. In the event her husband should predecease her, Mrs. Fisher's will granted eight particular legacies of $50,000. Subject to these bequests, and in contrast to her prior wills, Mrs. Fisher bequeathed the remainder of her vast estate to Ms. Toups.
On January 22, 2003, five days after Mr. Fisher's death, Mrs. Fisher again met with her longtime attorney to execute a new will. In this will, Mrs. Fisher made specific bequests of $50,000 to her church and $40,000 to Ms. Toups, in addition to granting substantially lesser amounts to five other individuals. Mrs. Fisher then bequeathed one-half of the residue of her estate to her nieces and nephews and the other half to Mr. Fisher's nieces and nephews. On this date, Mrs. Fisher also executed a power of attorney in favor of her cousin, Curtis Larson.
Less than two weeks later, Mrs. Fisher contacted another attorney, at Ms. Toups' behest, and had him draft yet another will. While omitting any provision in favor of her husband who had just died, this new will, dated February 3, 2003, was essentially identical to her April 2002 will. Hence, Ms. Toups was once again made Mrs. Fisher's universal legatee. At this time, Mrs. Fisher also executed an instrument to revoke the power of attorney that she had granted to her nephew, Guy Bruno, Jr. This document was apparently the product of some confusion on Mrs. Fisher's part since she had granted power of attorney to her cousin, Curtis Larson, not her *1051 nephew.[1] Mrs. Fisher then proceeded to grant a power of attorney in favor of Ms. Toups.
On February 5, 2003, Mrs. Fisher executed her last known will. This final will was essentially the same as the one she had executed two days earlier, except that it contained an additional provision specifying that each bequest would be subject to a reduction for taxes due as a result of the bequest as well as a pro rata share of the attorney fees, executrix fees, and other succession costs.
Upon learning that Mrs. Fisher had changed her will to exclude her family members and to favor Ms. Toups, two of her nephews instituted interdiction proceedings. Mrs. Fisher subsequently was interdicted and a restraining order was issued against Ms. Toups enjoining her from having any further contact with Mrs. Fisher. Following entry of the order, Ms. Toups had to be forcibly evicted from Mrs. Fisher's home by police officers.
In the interim, Mrs. Fisher's nephews also filed a separate suit in their capacity as curator and undercurator of Mrs. Fisher, naming Elaine Toups as defendant. That suit sought to annul Mrs. Fisher's February 5, 2003 will, as well as the power of attorney granted in favor of Ms. Toups. The nephews alleged that Mrs. Fisher did not possess the requisite capacity to comprehend the nature and consequences of her acts. They also alleged that Mrs. Fisher's estate consisted of approximately two million dollars in liquid assets, and that Mrs. Fisher executed the pertinent documents only as a result of Ms. Toups' ability to have undue influence over her. These claims were still pending when Mrs. Fisher died on June 27, 2005.[2]
Within eight and a half hours of Mrs. Fisher's death, Ms. Toups filed a petition to probate her February 5, 2003 will.[3] On July 1, 2005, two of Mrs. Fisher's nephews filed an emergency petition seeking to annul the will. On August 22, 2005, an amended petition to annul was filed, adding all of the Fishers' nieces and nephews as plaintiffs and adding as named defendants eight purported legatees of Mrs. Fisher's February 5, 2003 will. Again the plaintiffs claimed that Mrs. Fisher lacked the requisite capacity to execute the will and/or that she had been unduly influenced by Ms. Toups.
Thereafter, Ms. Toups and several other legatees of the will filed a motion for summary judgment seeking to dismiss the plaintiffs' petition to annul, claiming that there was no genuine issue of material fact "relating to the questions of incapacity or undue influence." In support of their motion, the defendants primarily relied on the affidavits of the two attorneys who had drafted wills for Mrs. Fisher in 2003, as well as the affidavits of some of the witnesses to those wills who stated that Mrs. Fisher seemed competent and did not appear to be under the influence of anyone.
In opposing the defendants' motion, the plaintiffs submitted the affidavits of numerous individuals. En masse, the affiants asserted Mrs. Fisher greatly feared being placed in a nursing home, yet her family members had absolutely no intention of ever putting her in one. Nevertheless, Ms. Toups repeatedly told Mrs. Fisher *1052 the falsehood that her relatives were planning to take her money and put her in a nursing home, thereby causing Mrs. Fisher to be continually upset and fearful.[4] They further maintained that Ms. Toups had gained complete control over the Fishers by September 2002, that she controlled all of their finances, and denied Mrs. Fisher access to her checkbook and to her money. They further claimed that Ms. Toups isolated Mrs. Fisher from her family by prohibiting her from speaking to her relatives on the phone and restricting their visits with her. When they did visit, Ms. Toups would not allow them to be alone with Mrs. Fisher at any time.
Furthermore, after Mrs. Fisher had revised her will in January 2003 to make various nieces and nephews, rather than Ms. Toups, her universal legatees, Ms. Toups began calling Mrs. Fisher's attorney seeking to have Mrs. Fisher's will changed. According to one affiant, Ms. Toups stated that if she ever lost control of Mrs. Fisher, she would do whatever it took to regain control of her. The plaintiffs maintain that Mrs. Fisher had ultimately come to fear Ms. Toups. In fact, after Ms. Toups was forcibly evicted from her home, Mrs. Fisher said of her: "If she comes back, I'll commit suicide."
In addition to the numerous affidavits, the plaintiffs also submitted the deposition testimony of Dr. Robert Blanche, a geriatric psychiatrist. Dr. Blanche had examined Mrs. Fisher on June 27, 2003, less than five months after she executed her final will. According to Dr. Blanche, Mrs. Fisher was in the early "middle" stage of dementia of the Alzheimer's type. Based on the administration of various diagnostic tests, he found that Mrs. Fisher showed impairment of a variety of cognitive faculties, including attention and concentration, short-term memory acquisition, and her orientation to person, place, and time. He further concluded that her remote memory recall was impaired. For example, she was unable to tell Dr. Blanche where she had been born. She also suffered visual spatial deficits and a speech deficit. Dr. Blanche's conservative estimate was that Mrs. Fisher's cognitive impairment had been going on for at least three to four years. In his opinion, Mrs. Fisher's "capacity to give informed consent, to make . . . important transactions about her estate . . . would have been impaired for at least several years." He did not believe that she could understand the nature of a transaction such as a will or comprehend the import of her actions or their consequences. He further stated that a person with dementia could be very easily manipulated.
Attached to Dr. Blanche's deposition was a copy of his report. Pursuant to this report, the stated purpose of Dr. Blanche's examination was to "determine if Mrs. Fisher had (or still has) the mental capacity to change her will or grant power of Attorney at the time she did so to the control of Elaine Foret Toups." His examination consisted of a comprehensive clinical interview, a discussion with Dr. Gerald Falgoust, Mrs. Fisher's treating physician, and a review of her records. His conclusion, as stated in the report, provides as follows:
It is my opinion that Mrs. Fisher has not had the requisite mental capacities to freely and willingly consent to sign over power of attorney or change her will for at least 3 years. This would require an ability to recall specific information about her estate (short and long *1053 term memory functions-which are severely impaired), abstraction ability (e.g.  knowing and understanding what all the issues are and consequences to the signing over "power of attorney" or changing her will.[)]
Also, persons with Dementia (at this stage) are highly suggestible and easy to manipulate, as their capacity to discern manipulation is impaired. Person[s] at the stage of dementia as Mrs. [Fisher is], live in "real time" that is, they cannot recall the immediate past, nor fully appreciate the future. Especially in a trusting woman as Mrs. Fisher, she could have been easily manipulated to sign over power of attorney or change her will by convincing her that family does not care about her (e.g. it is a common delusion in demented persons that they have been abandoned by family, since one could not recall when they were seen last). Her emotions, and thus her behavior, could easily be influenced by convincing her of false hoods such as the family being only interested in her money, when the evidence is to the contrary, since Mrs. Fisher has lost the capacity to discern the truth, much less negotiate any legal transaction. In such a person, it is easy to play on normal fears that elderly persons have (such as loss of security and independence and having to move away from home to a nursing home, etc normal issues/fears that persons with dementia maintain until well into the middle stage of the disease). It is also my opinion, based on the information described in the petition for interdiction, that the reported efforts to restrict contact of Mrs. Fisher from her relatives is highly suspicious of wrong doing and manipulation of Mrs. Fisher.
It is my recommendation that immediate legal action be taken against Elaine Toups for the protection of Mrs. Fisher's health and her rights. Elderly protection services should be alerted to this case.
A hearing on the defendants' motion for summary judgment was held on June 21, 2006. Following argument, the trial court concluded that the plaintiffs would be unable to prove their allegations by clear and convincing evidence at a trial. Accordingly, it granted summary judgment in favor of defendants and dismissed plaintiffs' suit with prejudice. From this judgment, plaintiffs appeal.

DISCUSSION
Standard of Review
Appellate courts review summary judgments de novo under the same criteria that govern the trial court's determination of whether a summary judgment is appropriate. Duplantis v. Dillard's Dept. Store, XXXX-XXXX, p. 5 (La.App. 1 Cir. 5/9/03), 849 So.2d 675, 679, writ denied, XXXX-XXXX (La.10/10/03), 855 So.2d 350. A motion for summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B); Independent Fire Insurance Company v. Sunbeam Corporation, 1999-2181, p. 7 (La.2/29/00), 755 So.2d 226, 230-31. The initial burden of proof is on the moving party. However, on issues for which the moving party will not bear the burden of proof at trial, the moving party's burden of proof on the motion is satisfied by pointing out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, the adverse party must produce factual support sufficient to establish that it will *1054 be able to satisfy its evidentiary burden of proof at trial; failure to do so shows there is no genuine issue of material fact. LSA-C.C.P. art. 966(C)(2); Duplantis, XXXX-XXXX at p. 5, 849 So.2d at 679-80.
Summary judgment is seldom appropriate for determinations based on subjective facts of motive, intent, good faith, knowledge, or malice; indeed, it may only be granted on subjective intent issues when no issue of material fact exists concerning the pertinent intent. See Jones v. Estate of Santiago, XXXX-XXXX, p. 6 (La.4/14/04), 870 So.2d 1002, 1006. We are further mindful that, in deciding a motion for summary judgment, a trial court must assume that all of the affiants and deponents are truthful. In other words, a trial court is prohibited from making any credibility determinations on a motion for summary judgment. Hutchinson v. Knights of Columbus, Council No. 5747, XXXX-XXXX, p. 8 (La.2/20/04), 866 So.2d 228, 234.
Testamentary Capacity
On appeal, the plaintiffs argue that the trial court erred in finding that the evidence they submitted "did not show factual support sufficient to establish that they would be able to satisfy a clear and convincing standard" that Mrs. Fisher lacked testamentary capacity when she signed the February 5, 2003 will.
To have capacity to make a donation mortis causa, a person must be able to comprehend generally the nature and consequences of the disposition that he is making. LSA-C.C. art. 1477. This capacity must exist at the time the testator executes the testament. LSA-C.C. art. 1471.
There is a presumption in favor of testamentary capacity. Succession of Lyons, 452 So.2d 1161, 1164 (La.1984). A person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity at the time the donor executed the testament. LSA-C.C. art. 1482(A). To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. In re Succession of Crawford, XXXX-XXXX, p. 8 (La.App. 1 Cir. 9/23/05), 923 So.2d 642, 647, writ denied, 2005-2407 (La.4/17/06), 926 So.2d 511.
Comment (f) to LSA-C.C. Art. 1477, provides, in part:
Cases involving challenges to capacity are fact-intensive. The courts will look both to objective and subjective indicia. Illness, old age, delusions, sedation, etc. may not establish lack of capacity but may be important evidentiary factors. If illness has impaired the donor's mind and rendered him unable to understand, then that evidentiary fact will establish that he does not have donative capacity. . . . The courts will look to the medical evidence that is available, such as the medical records and the testimony of treating doctors, and to other expert testimony, and to the testimony of lay witnesses. Clearly, no quick litmus-paper test exists to apply to the evaluation of mental capacity in all cases.
Thus, there are many sources of evidence to consider when evaluating a testator's capacity. In addition to the affidavits of lay witnesses, the plaintiffs herein also submitted expert medical testimony to establish that Mrs. Fisher lacked the requisite capacity at the time she executed her will. Nevertheless, in his oral reasons for judgment, the trial court stated:
[I]t all revolves around her capacity at that moment when she wrote that will; her capacity at that moment. And I've seen nothing that's going to be able to tell me at that moment, clear and convincing, she didn't when all the other *1055 indication is that she, and the testimony of people who were there . . . indicates she [did].
In light of this statement, we are compelled to conclude that the trial court noted a credibility determination was necessary and therefore, should have found that genuine issues of material fact exist, making summary judgment improper. As we previously noted, a party seeking a summary judgment is entitled to a favorable judgment only if "there is no genuine issue as to a material fact" and the "mover is entitled to judgment as a matter of law." Hutchinson, XXXX-XXXX at p. 8, 866 So.2d at 234. The credibility of witnesses and the capacity of a testator are questions of fact. Id.; In re Succession of Brantley, 1999-2422, p. 5 (La.App. 1 Cir. 11/3/00), 789 So.2d 1, 4, writ denied, XXXX-XXXX (La.3/30/01), 788 So.2d 1192.
No rule of law requires the court to only consider and/or credit the testimony of witnesses who were present at the execution of the will, while disregarding and/or discrediting the testimony of those who were not.[5] Indeed, the jurisprudence has long held that testimony regarding the actions of the decedent both prior to and after the execution of the will are relevant in determining whether the testator had capacity at the time he executed his will. See In re Succession of Brantley, 1999-2422 (La.App. 1 Cir. 11/3/00), 789 So.2d 1, writ denied, XXXX-XXXX (La.3/30/01), 788 So.2d 1192; Succession of Keel, 442 So.2d 691 (La.App. 1 Cir.1983); Succession of Brown, 251 So.2d 465 (La.App. 1 Cir.1971); Succession of Herson, 127 So.2d 61 (La.App. 1 Cir.1961); Succession of Ellis, 486 So.2d 260 (La.App. 3 Cir.1986); Succession of Landry, 545 So.2d 1107 (La.App. 5 Cir.1989).
In In re Succession of Pardue, 40,177 (La.App. 2 Cir. 11/8/05), 915 So.2d 415, writ denied, XXXX-XXXX (La.4/28/06), 927 So.2d 284, the second circuit affirmed a trial court's determination, made after a trial, that a testator had lacked the necessary capacity to execute a will. In that case, the trial court concluded that subsequently obtained expert medical testimony was clear and convincing evidence that a testator had lacked capacity despite the fact that it conflicted with testimony proffered by the witnesses to the disputed will.
Accordingly, we simply cannot say as a matter of law, with the facts at issue still unresolved, that the plaintiffs in the present matter are not entitled to present their case to a factfinder at a trial. Indeed, a trial is designed specifically to evaluate the facts when credibility is at issue. Hutchinson, XXXX-XXXX at p. 8, 866 So.2d at 234.
Accordingly, we find that the trial court erred in granting the defendants' motion for summary judgment on the issue of testamentary capacity based upon its conclusion that the plaintiffs would be unable to prove this allegation by clear and convincing evidence at trial. A fortiori, we also find that summary judgment was improperly granted with respect to the issue of undue influence, which, in this case, need only be proven by a preponderance of the evidence.
Undue Influence
A donation mortis causa shall be declared null upon proof that it was the product of influence by the donee or another person "that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition *1056 of the donor." LSA-C.C. art. 1479. Louisiana Civil Code article 1479, comment (b)[6] further elaborates:
[T]he objective aspects of undue influence are generally veiled in secrecy, and the proof of undue influence is either largely or entirely circumstantial. . . . [E]veryone is more or less swayed by associations with other persons, so this Article attempts to describe the kind of influence that would cause the invalidity of a gift or disposition. Physical coercion and duress clearly fall within the proscription of the previous Article. The more subtle influences, such as creating resentment toward a natural object of a testator's bounty by false statements, may constitute the kind of influence that is reprobated by this Article, but will still call for evaluation by the trier of fact. Since the ways of influencing another person are infinite, the definition given in this Article is used in an attempt to place a limit on the kind of influence that is deemed offensive. Mere advice, or persuasion, or kindness and assistance, should not constitute influence that would destroy the free agency of a donor and substitute someone else's volition for his own.
Generally, a person who challenges a donation because of fraud, duress, or undue influence, must prove it by clear and convincing evidence. However, if at the time the donation was made or the testament executed, a relationship of confidence existed between the donor and the alleged wrongdoer and the alleged wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress, or undue influence by a preponderance of the evidence. LSA-C.C. art. 1483.
In its oral reasons, the trial court noted: "If this were a preponderance of the evidence case, then we need to look at some things. But clear and convincing, I just don't see you showing me anything that's going to be able to overcome what's in the record here." Thus, it is apparent that the trial court believed that the plaintiffs would be required to prove undue influence by clear and convincing evidence. However, the relationship between a donor and an unrelated caregiver has been recognized as a relationship of confidence. In re Succession of Gilbert, 37,047, pp. 7-8 (La.App. 2 Cir. 6/5/03), 850 So.2d 733, 737, writ denied, XXXX-XXXX (La.11/7/03) 857 So.2d 493. Accordingly, at trial, the plaintiffs herein would only be required to prove undue influence by a preponderance of the evidence. The evidence submitted by the plaintiffs unquestionably presented a genuine issue of material fact regarding Ms. Toups' alleged undue influence, as implicitly recognized by the trial court in the aforementioned quote. Accordingly, we find that the trial court erred in granting defendants' motion for summary judgment on the issue of undue influence as well.

CONCLUSION
For all of the foregoing reasons, the summary judgment rendered in favor of defendants is hereby reversed, and this matter is remanded to the trial court for further proceedings consistent with the opinions expressed herein. All costs of this appeal are assessed to the defendants: Elaine Toups, Priscilla Newman, Laverne *1057 Parnell, Juanita Barbay, Huey Simms, and Lee Gilchrist.
REVERSED AND REMANDED.
GAIDRY, J., concurs without reasons.
NOTES
[1] On February 21, 2003, Mrs. Fisher revoked the power of attorney she had granted to Curtis Larson.
[2] This suit had been consolidated with the interdiction proceedings; however, on July 23, 2004, a final judgment interdicting Mrs. Fisher had been signed, thus ending that particular matter.
[3] In July 2005, the succession proceedings were transferred and consolidated with the two prior suits.
[4] It is undisputed that Mrs. Fisher was never placed in a nursing home, but rather died at her home.
[5] At trial, the trial court is charged with assessing the credibility of witnesses and, in so doing, is free to accept or reject, in whole or in part, the testimony of any witness. See Morrison v. Morrison, XXXX-XXXX, p. 5 (La. App. 1 Cir. 9/19/97), 699 So.2d 1124, 1127.
[6] According to LSA-C.C. art. 1479, comment (b), this article presumes a donor has capacity. Obviously, if a donor lacks capacity, then the entire donation or will is invalid for that reason alone, and issues of fraud and undue influence are irrelevant.