STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2022 CA 0852


SUCCESSION OF JOHN L. CAZENAVE, JR.


Judgment Rendered:  **MAR 0 1 2023**


* * * * *

Appealed from the
22nd Judicial District Court
Parish of St. Tammany, State of Louisiana
No. 2021-30544

The Honorable William H. Burris, Judge Presiding


* * * * *


| | |
|---|---|
| G. Brice Jones | Attorneys for Appellant, |
| Paul D. Hesse | Ida Gambino Cazenave |
| Jeffrey L. Oakes | |
| Slidell, Louisiana | |
| | |
| Alison C. Bondurant | Attorneys for Appellees, |
| Brittany J. Walker | Annie Cazenave Carter and |
| Covington, Louisiana | Denise Michelle Cazenave |


* * * * *


BEFORE:  GUIDRY, C.J., WOLFE AND MILLER, JJ.

**WOLFE, J.**

This is an appeal of a judgment that reopened the decedent's succession, nullified the will executed by the decedent shortly before his death due to lack of testamentary capacity, and nullified the judgment of possession that placed the decedent's widow in possession of the decedent's property. We affirm.

## FACTS

John L. Cazenave, Jr., known as "Johnny," died of pancreatic cancer on April 27, 2020, at the age of 65. He was survived by his wife of almost two years, Ida Gambino Cazenave, and his adult children from a prior marriage, Annie Cazenave Carter and Denise Michelle Cazenave.

On March 5, 2020, weeks before his death, Johnny executed a will ("the March 5 will") that left all of his property to Ida in the event he predeceased her, revoking his prior will that left his property to Annie and Denise. In May 2021, Ida filed a petition to be put in possession of Johnny's estate without administration, in accordance with the March 5 will. Based on the petition, the trial court signed a judgment of possession on May 26, 2021, which recognized Ida as the owner of Johnny's estate.

Approximately five months after the judgment of possession was signed, Annie and Denise filed a petition to reopen their father's succession and annul the March 5 will. Pertinently, they alleged that that at the time their father executed the will he lacked testamentary capacity because of the strong prescriptive medications he was taking as part of his cancer treatment. They further alleged that the will was a result of Ida's undue influence. Thus, they asked the trial court to annul the March 5 will and set aside the May 26, 2021 judgment of possession based thereon. They further asked the trial court to probate their father's prior will dated September 19, 2014, which bequeathed all of his property to them.

2

A bench trial on the petition to annul was held on February 23, 2022. Annie and Denise offered medical evidence to establish the severity of Johnny's condition, the medications with which he was being treated and their effect on a person's cognitive abilities, evidence that Johnny expressed his wish for his house to pass to his daughters, and evidence that Johnny disagreed with the terms of the March 5 will when they were explained to him. In contrast, Ida offered evidence that Johnny wanted her to inherit his property and that several people who interacted with Johnny in the days before and after the will was executed, including the notary and witness to the will, had no concerns about Johnny's capacity.

Based on the evidence presented, the trial court found that Johnny lacked testamentary capacity to execute a will on March 5, 2020. In oral reasons, the trial court stated that it found that the witnesses presented by Annie and Denise were credible and that the medical testimony they presented was entitled to great weight. In contrast, the trial court stated it found that many of Ida's witnesses were not credible or provided testimony that was not particularly relevant to the issue presented. In accordance with its oral ruling, the trial court signed a judgment on March 16, 2022, which annulled the March 5 will and the May 26, 2021 judgment of possession.

Ida now appeals.[1]

## DISCUSSION

A valid donation *mortis causa* through a last will and testament requires that the testator have testamentary capacity at the time he executes the will. La. Civ. Code arts. 1471 and 1570. Testamentary capacity is the ability to generally comprehend the nature and consequences of the disposition the testator is making.

---

[1] A judgment annulling a will is final and appealable although it does not conclude the succession proceeding. See **In re Succession of Theriot**, 2008-1233 (La. App. 1st Cir. 12/23/08), 4 So.3d 878, 881-82; see also **In re Succession of McLean**, 2009-1851 (La. App. 1st Cir. 6/11/10), 2010 WL 2342752, *2 (unpublished).

See La. Civ. Code art. 1477. All persons are presumed to have testamentary capacity. **In re Fogg**, 2019-0719 (La. App. 1st Cir. 2/21/20), 298 So.3d 291, 294, writ denied, 2020-00819 (La. 10/14/20), 302 So.3d 1124. A person challenging testamentary capacity must prove by clear and convincing evidence that the testator lacked capacity at the time he executed the will. La. Civ. Code art. 1482(A). The clear and convincing standard requires proof that the existence of the contested fact is highly probable, or much more probable than its non-existence. **Talbot v. Talbot**, 2003-0814 (La. 12/12/03), 864 So.2d 590, 598.

The issue of testamentary capacity is a question of fact; therefore, the trial court's finding that the testator possessed or lacked capacity will not be disturbed on appeal in the absence of manifest error. **In re Succession of Alexander**, 2015-0722 (La. App. 1st Cir. 11/9/15), 2015 WL 6951416, *3 (unpublished); see also **Stobart v. State, Through DOTD**, 617 So.2d 880, 882 (La. 1993). Under the manifest error standard, the appellate court does not decide whether the trial court was right or wrong; rather, the appellate court is required to consider the entire record to determine whether a reasonable factual basis exists for the finding and whether the finding is manifestly erroneous or clearly wrong. **Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC**, 2015-2592 (La. 12/8/15), 193 So.3d 1110, 1116. In conducting its review, the appellate court must not reweigh the evidence or substitute its own factual finding because it would have decided the case differently. **Pinsonneault v. Merchants & Farmers Bank & Trust Co.**, 2001-2217 (La. 4/3/02), 816 So.2d 270, 279. This is especially true when the trial court's factual finding is based on witness credibility, for only the trial court can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. **Tregre v. Fletcher**, 2020-0859 (La. App. 1st Cir. 2/19/21), 321 So.3d 414, 416. Thus, a trial court's conclusion that is based on its decision to credit the testimony of particular

4

witnesses can virtually never be manifestly erroneous. **Adams v. Rhodia, Inc.,** 2007-2110 (La. 5/21/08), 983 So.2d 798, 807.

The evidence presented by Annie and Denise established that Johnny was diagnosed with pancreatic cancer in September 2018, two months after he married Ida. Johnny's oncologist, Dr. Jack E. Saux, III, who testified as an expert in the field of oncology and internal medicine, explained that pancreatic cancer typically causes pain in the mid-abdomen, where the pancreas is located, as well as increased fluid in the abdominal and chest cavities. The cancer is likely to spread to the liver, which may obstruct bile flow and cause pain, can invade the small intestines and cause ulcerations, and can spread to other parts of the body. Johnny's treatment was originally successful and, by March 2019, there was no evidence of disease. Therefore, Dr. Saux continued to regularly monitor Johnny's condition for recurrence.

At a January 6, 2020 visit, Johnny complained of back pain, despite taking Oxycodone prescribed by a pain management doctor. Shortly thereafter, it was determined that Johnny's cancer had not only recurred but spread. Once Johnny's pain was linked to the cancer and associated treatments, Dr. Saux assumed its management and prescribed a variety of medications, including Oxycodone. On January 17, 2020, Ida contacted Dr. Saux's office, reporting that Johnny had uncontrolled pain. Johnny was then prescribed a Fentanyl patch and Dilaudid.

Dr. Saux explained that Oxycodone is a very strong narcotic pain medication that affects receptors in the brain that dull pain, and at least temporarily, alters thinking and mental status. Dilaudid is hydropmorphine, a stronger, more potent narcotic that can be taken more frequently than Oxycodone because of its shorter half-life. Fentanyl is an even stronger narcotic pain medication dispensed through the skin by a patch to maintain a baseline level in the system, resulting in a tolerable pain level and decreased need for oral medication.

5

Dr. Saux testified that starting pain medication or altering the dosage may cause drowsiness, dizziness, unsteady gate, the appearance of intoxication, nausea, or vomiting. Even at a smaller dose, hydromorphone has similar side effects to other narcotics, including altered mental state, dizziness, or nausea. Dr. Saux stated that if a person not taking narcotics began taking Fentanyl, they would become drowsy, dizzy, nauseous, and would be unable to operate a vehicle. Combining the drugs would decrease a person's ability to think, affect speech, and likely cause some amnesia or inability to remember how things happened or a person with whom they had talked.

Dr. Saux explained that after the medications were initially prescribed, the dosages were adjusted as necessary and other medications were added, including the muscle relaxer, Zanaflex. He stated that combining a muscle relaxer with the other pain medications causes drowsiness, forgetfulness, and nausea or dizziness. However, as a person becomes accommodated to the medications and the pain is controlled, the person is less impaired, more functional, and may not appear intoxicated.

In mid-February 2020, Johnny began chemotherapy to treat the cancer. Dr. Saux identified the particular drugs administered and described their potential side effects, noting that Johnny had some nausea but did not suffer the sedation possible with one of the drugs. Thereafter, the prescribed dosages of Dilaudid and Fentanyl were nearly doubled to control Johnny's pain.

Johnny's younger brother, Philip Cazenave, testified that he saw and spoke to Johnny regularly during February 2020. Mr. Cazenave described visiting Johnny on the afternoon of February 14 to deliver a Valentine's Day gift Johnny asked him to get for Ida. Mr. Cazenave, who remembered Johnny as "larger than life," found Johnny in bed, curled in a fetal position. Mr. Cazenave explained, "[T]hat's when it really hit me. That it was pretty bad."

6

On February 27, 2020, after his first round of chemotherapy, Johnny was hospitalized with bacteremia, a bacterial blood infection. Dr. Saux described Johnny as "very sick" on that day with fever, confusion, and uncontrolled vomiting, stating "unless you have been around a cancer patient, you probably haven't seen people this sick."

Dr. Saux's nurse, Nicole Diaz, who testified as an expert in the field of medicine and oncology as an advanced oncology certified nurse practitioner, examined Johnny on February 27. In the post-visit notes that she typed, Nurse Diaz described Johnny as suffering from fever and confusion. At trial, Nurse Diaz recalled that Johnny was "Listless, kind of just sitting there. Apathetic. Not saying much. Hunched over. Not able to answer my questions appropriately when I was evaluating him. Altered mental status." She acknowledged that a checklist completed by a medical assistant was marked negative with regard to confusion; however, Nurse Diaz agreed that her own notes "trump[ed]" the entries by the medical assistants and that she was certain Johnny was confused on that date.

Johnny remained in the hospital until March 2, 2020, when he was discharged to home healthcare services with an IV antibiotic prescribed for nine days. Dr. Saux indicated that Johnny was still very sick but explained that Johnny "at least felt well enough that he didn't want to be in the hospital. This was not the type of guy who liked to be anywhere but at his place. ... as soon as he was feeling what he thought was well enough, he was going to be home." Nurse Diaz did not examine Johnny on March 2, but agreed that Johnny had to have improved to some degree, acknowledging that Johnny was not discharged against medical advice.

Records from the home healthcare provider that were submitted as evidence indicate that on March 4, 2020, Johnny was home bound, in pain, suffering incontinence, had shortness of breath, and had limited ambulation. On a supportive assistance assessment form, the ability of the patient to manage finances was marked

7

to indicate that Johnny needed assistance. On a pain scale form, Johnny's pain was described as a level six of ten, which was made worse by activity and improved with rest and medications. The medications Johnny was taking for pain were listed as hydromorphone, fentanyl patches, and ibuprofen. On the same date, a neurological, emotional, and behavioral assessment form was completed that noted Johnny was oriented to person, place, and time; disoriented; and forgetful. The form was marked to indicate that within the previous fourteen days, Johnny was confused in new or complex situations; however, no memory deficit, impaired decision making, or disruptive behavior was noted. A fall risk assessment form was marked to indicate cognitive impairment, which the form noted "[c]ould include patients with dementia, Alzheimer's or stroke patients or patients who are confused, use poor judgment, have decreased comprehension, impulsivity, [or] memory deficits[,]" and instructed to "[c]onsider [the] patient's ability to adhere to the plan of care."

Ida and Johnny consulted with a notary on March 4, and on March 5, Johnny executed the will at issue, in which he left all of his property to Ida.

Neither Dr. Saux nor Nurse Diaz examined Johnny or saw him take any medications on March 4 or 5. However, based on the information in Johnny's medical records, his treatment of Johnny, and all of the information presented, Dr. Saux testified that in his expert opinion there was "no doubt" that Johnny was unable to understand the nature and consequences of the March 5 will. When questioned about what would have happened if Johnny was not taking his pain medications during that time period, Dr. Saux stated Johnny would have been in excruciating pain and unable to tolerate movement or activity. Dr. Saux explained that Johnny would have had to stop taking all pain medications by March 3 for them to clear from his system and leave him cognitively functional on the day the will was executed. Even if that was the case, Dr. Saux opined that Johnny would have been

8

in such distress from pain and otherwise sick that Johnny would not have been able to understand the nature and consequences of his actions on March 5.

When asked if he would be surprised to hear Johnny drove on that day, Dr. Saux answered that he would at first be surprised; however, Dr. Saux acknowledged that after recovering from sepsis and having adequate pain relief that was able to "level out," Johnny may have been "more cognitively functional." Dr. Saux explained that "[Johnny] would have also been the guy that always got in his truck and went where he wanted, no matter how he was feeling. And if he had to go do something, or had in his mind he was going to get in the car and go, safe or not, he may have done it." Dr. Saux continued, "So because I knew him a little bit, I wouldn't be surprised if he got in the truck and drove somewhere. But on that amount of medicine, I also wouldn't have been surprised if he got lost or went in the ditch or something worse while he was driving."

Nurse Diaz similarly expressed that in her opinion, with reasonable medical certainty, Johnny's cognition would have been affected if he was taking his medications as prescribed. She further stated that she assumed he was taking the prescribed medications based on the prescriptions being filled and her conversations with Johnny over the course of his treatment about adjusting his medications to manage his pain. She described seeing Johnny during a telemedicine appointment on March 18 and, based on his demeanor before and after March 5, she did "not think [Johnny] was in his normal mental capacity and state to be able to execute a will."

Johnny's close friends, Junius Elswood "J.E." Cox, Jr., and his wife, Linda Cox, who was also Ida's cousin, testified that they saw Johnny on March 6, the day after the will was executed. They explained that Johnny was with Ida at the hospital when her father passed away and that they all went to a restaurant for lunch. Both described Johnny as not being his usual self. Mrs. Cox stated that Johnny was quiet

9

and said he was not feeling well. This was in contrast to her memory of Johnny before suffering from cancer being "the life of the party." Mr. Cox agreed that before his cancer, if Johnny was there, "you would know." Mr. Cox stated that on March 6, "Johnny was putting on a good face, but he wasn't Johnny."

The Coxes testified that they saw Johnny again at a family gathering for Ida's deceased father on March 8, where Mr. Cox and Johnny spent time sitting together outside. Mr. Cox stated that Johnny let it be known he was not feeling well. Based on her observations of Johnny between February and March 2020, Mrs. Cox stated that she told her husband she did not think Johnny would be with them much longer.

Annie testified that Ida gave her a copy of the March 5 will in early April. Annie stated that her father was living with her at that time, so she asked him if he knew that the will stated that Ida would get everything while she and her sister would get nothing. She testified that her father "looked at [her] ... cockeyed and funny" and stated, "It's not supposed to say that."

Annie testified that the conversation with her father continued:

> I was, like, "Well, did you read it when, you know, you went to go get this done?" And he is, like, "No, Annie. I was sick. I had been throwing up. I was in a lot of pain. And she told me what it said, and I just signed it." He's like, "I just trusted her. It said what I wanted it to say," you know.
> And I was, like, "Well, no. Like it says that she gets everything." And he was, like, immediately, he was, like, no. He is, like, "We need to call her and talk about this." And so, I called her."

Annie testified that Ida came to her house the next day, which she guessed to be around April 12, and she, her father, and Ida talked about the will. She stated that Johnny told Ida the will "didn't say what it was supposed to say." Annie quoted Ida as responding "Okay. Okay. Okay, Johnny. We'll get it fixed." Approximately two days later, Johnny was admitted to the hospital for the final time and became nonverbal before being discharged to hospice care at Annie's home. Johnny passed away on April 27.

Mrs. Cox testified that after Johnny's marriage to his children's mother ended, he expressed his wish for his house to go to his children. Mr. Cox stated that as part of his property settlement with the children's mother, Johnny agreed that the children would inherit the house, and that Johnny stated he would honor the agreement. Mrs. Cox stated that after he married Ida, Johnny indicated that he would leave the house to his children, but that he wanted Ida to have the use of it until she died. Mr. Cox had a similar recollection. Mrs. Cox explained that Johnny worried, in particular, about his daughter Denise, a single mother who lived on the property with her young child, and that Johnny wanted to ensure that Denise was "taken care of." Mr. Cazenave testified that Johnny always said he would leave his property to his children and never said anything about leaving his property to Ida.

When asked why she and her sister waited to contest the will, Annie testified that they questioned whether they could win a legal challenge. Annie explained that someone in Dr. Saux's office reached out, likely after seeing "a little rant" she posted on Facebook, and encouraged them to seek an attorney because they did not believe Johnny had the requisite testamentary capacity to execute a will on March 5.

In defense of the will, Ida testified that on March 4, Johnny woke up and asked her if she wanted to go and have their wills prepared. She explained that Johnny told her what he wanted done and dictated a note explaining his wishes, which she drafted. She stated that Johnny chose the place to have the wills prepared and drove them to the business in his truck. Ida was certain they met with the notary on March 4, as verified on a receipt for payment of the notary's services, and that she and Johnny returned on March 5 to execute the wills, with Johnny again driving them. Ida testified that during that time, Johnny "had all of his scruples" and "knew what he was doing." When questioned directly by the trial court as to whether Johnny was taking his prescribed medication at the time, Ida answered that Johnny was

11

applying a Fentanyl patch every 72 hours, taking Dilaudid at night, and taking Ibuprofen.

Ida and Johnny went to the business "Notary For Less, DMV Express, Louisiana Tag and Title," which was co-owned by Robert John Comeaux, who notarized the March 5 will, and his fiancée, Monica Hughes. In describing the way they conducted business, Ms. Hughes explained that she and Mr. Comeaux interviewed clients who came in requesting a will. She explained that she would talk to and interview the client, then voice her opinion to Mr. Comeaux, who would also talk to the client, then she and Mr. Comeaux would agree on whether to handle the will. She explained that if they could not handle the client's request they referred the client to an attorney. When asked how they would handle a client requesting a will who they felt may not have testamentary capacity, Ms. Hughes answered, "Oh, no, no. It will never happen in our office. We send them to our attorney. Can't handle it. Can't help you." She further stated, "We have done it a lot."

Ms. Hughes testified that she was present when Johnny and Ida came in for their initial consultation but was not present when Johnny executed the will. She remembered Johnny as a sweet and kind man who was concerned about his wife. Ms. Hughes testified that Johnny "was so comfortable. He leaned back in the chair. And he said, 'I want my wife taken care of. ... I don't want my wife to have to worry.'" She stated that she had no concerns about Johnny's capacity to effectively execute a will when she met him. Ms. Hughes testified that she was unaware that Johnny had pancreatic cancer or was prescribed medications that included Oxycodone, Dilaudid, and Fentanyl. When asked if knowledge of the prescribed medications changed her testimony, Ms. Hughes replied that "[Johnny] knew what he wanted."

Mr. Comeaux, a Louisiana notary of thirty-one years, testified that he always followed a set protocol to allow a client that requested a will to exhibit that they have

testamentary capacity. Mr. Comeaux characterized the protocol as a "set of rules" used every time he sat down with someone. He explained that this would involve an individual conversation with each client for the client to explain what they wanted him to do for them and why. When asked to describe the protocol he used to allow the client to demonstrate capacity, he answered:

> Well, we look for an individual to exhibit mental competence. We look for an understanding, that they have a clear understanding of what they're doing. The nature of their actions and their dispositions. We look for them to have a good memory. And we also look for a sound mind with no undue influence from medications or individuals. That's the exact protocol that we use, that I use.

Mr. Comeaux explained that after the initial consultation, the time it took to prepare the documents for the client to review depended on the particular request and his workload.

Mr. Comeaux recalled consulting with Johnny and Ida in March 2020, about a basic planning package that included powers of attorney and wills for both of them. Mr. Comeaux's file in this matter included a copy of the handwritten notes, which according to Ida, Johnny dictated to her. Mr. Comeaux testified that the note was presented by Johnny and Ida when they initially came into the business. When asked what Johnny and Ida said when presenting it, he explained "That's what they wanted to do. That's what [Johnny] wanted, what you see right there." Mr. Comeaux stated that he did speak with Johnny separately from Ida but could not recall his exact conversation with Johnny about the note. Mr. Comeaux testified, "I read it. And then, I said, 'Well, this is a pretty good indication of what you want to do.'" Mr. Comeaux explained that after he prepared the will, he had two witnesses come in, had Johnny declare aloud that it was his last will and testament according to law, had Johnny sign, had the witnesses sign, and then he notarized the will.

Mr. Comeaux testified that he did not, at any time, feel that Johnny lacked testamentary capacity, maintaining that Johnny "knew exactly what he was doing."

However, Mr. Comeaux could not recall the specifics of any conversations with Johnny, noting that the conversations occurred approximately two years prior to trial. When asked about his inability to recall the conversation on cross examination, Mr. Comeaux responded, "That's the funny thing about memory and remembering. It seems to be all about forgetting." Nonetheless, Mr. Comeaux stated he knew Johnny had "a serious illness" and recalled that on March 5, Johnny's physical appearance was normal and that Johnny did not appear to be in pain. Mr. Comeaux further testified that despite his inability to recall his particular conversations with Johnny, "What doesn't change … is … the rules and the protocol that we use to determine if we are going to prepare his will. … And he met or exceeded those requirements."

Brandi Tarnok Harvey testified that she owns a hair salon next door to the notary office and acted as a witness for them approximately four times per month. She recalled being asked to step next door to do so on March 5, 2020, and recalled being present for approximately twenty minutes when Johnny executed his will. Ms. Harvey testified that she had never met Johnny or Ida before and did not know that Johnny was being treated for pancreatic cancer or taking medication; however, she stated that she checked Johnny's identification, interacted with him, and believed that he understood that he owned property that he was transferring to his wife through the will. When asked by the trial court if she had any discussions with Johnny, Ms. Harvey answered in the affirmative, explaining that she commented on his signature, thinking it was nice, and that they talked about football and her salon. She admitted that Johnny did not ask or tell her anything about the will specifically but stated, "He said he wanted it for his wife. … He just said he wanted everything to go to his wife."

Antonio Guiliano, who sells alkaline water systems, testified that he met with Johnny for approximately three hours on March 7, at a sales appointment made by

14

Annie. Mr. Guiliano explained that he gave a presentation to Johnny and Ida on the water system, during which Johnny was awake and paid attention, and the system was ordered days later. Mr. Guiliano stated that he and Johnny "had a great conversation" on the day of the sales presentation and described Johnny as "sharp, sharp as a tack." Mr. Guiliano noted that the sales meeting took place after Annie checked to see how Johnny was feeling after running a fever the night before. Mr. Guiliano was aware Johnny was undergoing chemotherapy to treat pancreatic cancer but was unaware that Johnny was taking narcotics.

Johnny's neighbor and friend, Roch Petersen, testified that he remembered seeing Johnny at home in March after Johnny was discharged from the hospital. He stated he knew Johnny was ill, but that Johnny seemed "pretty much normal." Mr. Petersen agreed it was fair to say that Johnny still had his wits about him and did not seem confused. However, Mr. Petersen could not say specifically when he saw Johnny after Johnny left the hospital.

Ida testified that it was Johnny's idea to execute the March 5 will, that he knew what he was doing, and that he intended for everything to go to her if he predeceased her. When asked if he said anything about his daughters when she wrote the note that was presented to the notary, Ida answered that Johnny knew if he died before her that she would give everything to his daughters when she died. To the trial court's question of whether the April conversation that Annie described occurred, Ida answered "I don't recall." She stated that she remembered taking Annie a folder containing her own and Johnny's wills but did not recall any conversations about the will.

Before making its oral ruling, the trial court stated that many witnesses, such as Mr. Roch, did not offer a lot of relevant information. The trial court stated that although Ms. Harvey, Mr. Comeaux, and Ms. Hughes testified about March 4 and 5 in particular, it found that "none of them were very impressive." The trial court

15

explained that Mr. Comeaux was unable to remember any specific details on which he based his decision to prepare and notarize the will. The trial court stated that the testimony of other witnesses who testified about Johnny's prior wishes about the disposition of his property did not particularly influence its determination of Johnny's capacity on March 5.

In contrast, the trial court stated that it put "a lot of weight" on the testimony of Dr. Saux and Nurse Diaz, which it recognized was qualified on the assumption that Johnny was taking his prescribed medications. The trial court indicated their testimony was supported by proof the prescriptions were being filled regularly and medical notes indicating Johnny was taking medications and that dosages were being adjusted as needed.

Finally, the trial court stated it also placed significant weight on Annie's testimony, finding her to be "very credible" in her testimony about the conversation with her father and Ida about the terms of the March 5 will. The trial court remarked that it tended to believe Annie, noting that Ida claimed she could not remember the conversation.

Ida argues on appeal that in finding that Johnny lacked testamentary capacity, the trial court committed reversible error by excluding or disregarding relevant testimony presented by numerous witnesses. In particular, she argues that the trial court erred in disregarding or discounting the testimony of Mr. Comeaux, as the trial court's reason for doing so was unsupported by the record and the testimony was highly relevant. She contends that the trial court further erred in placing significant weight on the testimony of Dr. Saux and Nurse Diaz, arguing that their testimony was circumstantial, speculative, qualified, inconsistent, heavily biased in favor of Annie and Denise, and conclusively rebutted by other witnesses who interacted with Johnny at the time the will was executed. Ida suggests that Annie's testimony, which the trial court found to be credible, actually supports a finding of capacity and that

16

the trial court's conclusion to the contrary was manifestly erroneous. Ida claims that when properly considered, the evidence presented by Annie and Denise is insufficient to overcome the presumption of capacity.

As a general principle, testimony regarding the decedent's actions both prior to and after execution of a will is relevant to determining the decedent's testamentary capacity. See **In re Succession of Fisher**, 2006-2493 (La. App. 1st Cir. 9/19/07), 970 So.2d 1048, 1055. Revision Comments – 1991, Comment (f) to La. Civ. Code art. 1477 explains:

> Cases involving challenges to capacity are fact-intensive. The courts will look both to objective and subjective indicia. Illness, old age, delusions, sedation, etc. may not establish lack of capacity but may be important evidentiary factors. If illness has impaired the donor's mind and rendered him unable to understand, then that evidentiary fact will establish that he does not have donative capacity. Outrageous behavior by an individual may or may not be indicative of lack of ability to understand. Some outrageous behavior may be nothing more than a personality quirk, while other outrageous behavior may manifest serious mental disturbance. Each case is unique. Heavy sedation should be a strong factor to consider, since the sedative effects of the drug may impair the ability of the person to comprehend the nature and consequences of his act.
>
> The courts will look to the medical evidence that is available, such as the medical records and the testimony of treating doctors, and to other expert testimony, and to the testimony of lay witnesses. Clearly, no quick litmus-paper test exists to apply to the evaluation of mental capacity in all cases.

To resolve the fact-intensive inquiry at trial, the trial court is charged with assessing the credibility of witnesses and, in so doing, is free to accept or reject, in whole or in part, the testimony of any witness. **In re Succession of Fisher**, 970 So.2d at 1055 n.5.

In this case the trial court was required to make credibility determinations with regard to the various witnesses. We find no error in the trial court's decision to credit the expert testimony of Dr. Saux and Nurse Diaz over that of lay witnesses who observed Johnny for isolated time periods. Dr. Saux and Nurse Diaz treated Johnny over the course of his illness and explained the effects the treatment drugs have on

17

a person's cognitive function, as well as the pain that would have resulted if the drugs were stopped. Further, we find no error in the trial court's decision to reject what was essentially self-serving testimony by Mr. Comeaux that he would not have notarized a will if there was any question that the client lacked capacity. Based in large part on its credibility determinations, the trial court found that Johnny lacked testamentary capacity to execute the March 5 will. Giving deference to the credibility determinations made by the trial court, we find no manifest error in the trial court's finding. The record establishes that Annie and Denise proved Johnny's lack of testamentary capacity by clear and convincing evidence.[2] Ida's arguments to the contrary lack merit.

## CONCLUSION

For the foregoing reasons, we affirm the March 28, 2022 judgment of the trial court that annulled the last will and testament executed by John L. Cazenave, Jr., on March 5, 2020, and further annulled the Judgment of Possession dated May 26, 2021. Costs of this appeal are assessed to Ida Gambino Cazenave.

**AFFIRMED.**

---

[2] On appeal Ida suggests it is impossible to discern the burden of proof applied by the trial court, relying on the trial court's failure to cite the applicable burden of proof in its oral reasons. However, the trial court's reasons were expressed orally at the conclusion of trial and did not purport to formally outline the trial court's legal analysis. Rather, the trial court stated it was merely reviewing its notes regarding the various witnesses so the parties would understand its decision. Silence as to the applicable legal standard does not, in and of itself, equate to proof that the wrong legal standard was applied. See **Headley v. Textron Systems**, 2020-1174 (La. App. 1st Cir. 4/26/21), 324 So.3d 1080, 1084. Our review of the record has revealed no indication that the trial court erred as Ida implies. Moreover, we find that the record establishes that Annie and Denise proved lack of testamentary capacity by clear and convincing evidence.